WILL OF KLOFANDA: STENICKA and another, Objectors and Appellants, vs. THOMAS and wife, Proponents and Respondents.

*April 14—May 11, 1948.*
*January 21—February 15, 1949.*

For the appellants there were briefs by *Wilbershide & Baumblatt* of Racine, and oral argument by *L. P. Baumblatt*. *Oscar M. Edwards* of Racine, for the respondents.

WICKHEM, J. *(on rehearing)*. Decedent died on October 27, 1946, at the age of eighty-two. He had lived in Milwaukee for many years prior to his death. His wife had died many years before he did. He had three sisters, Lyddia Schissler, Mary Miller, and Libbie Stenicka. He also had a half sister and three half brothers.

On March 29, 1926, deceased executed a will dividing his property among his three sisters and appointing two of them, Mary Miller and Libbie Stenicka, executors of the will. In this will he specifically stated that he did not desire his half sister and half brothers to participate in the distribution. On May 7, 1940, he executed a codicil having reference to a headstone but made no change in the original disposition. Upon the death of Mary Miller and Libbie Stenicka in 1945 deceased made a new will. In this will he bequeathed building and loan stock of the total value of $1,000 to his nephew, Ray Stenicka, one of the three surviving children of Libbie Stenicka, and gave the balance of his property to his only living sister, Lyddia Schissler. She was appointed executrix without bond. The will repeated the statement that he did not desire his half sister and half brothers to participate in the estate. Olive Thomas, one of the proponents of the will, originally married a first cousin of deceased and through this marriage became acquainted with decedent and with Mary Miller and her husband, Andrew. In 1934 she married Iren Thomas and about this time visited considerably with decedent and with Mary and Andrew Miller, as decedent visited frequently at the home of his sister and her husband. During all this time decedent, however, had a room in Milwaukee, commonly visiting the Millers on week ends. There is evidence that during the depression Mary and Andrew Miller

became destitute except for an old-age pension and that Olive and Iren Thomas visited them regularly and gave them food and money. In October, 1944, Mary Miller executed a will giving her household furniture to her husband, some minor bequests to her sisters, and the residue of her estate to Olive and Iren Thomas to be held by them in trust to pay her husband $50 a month or more as his needs might require during his life and to take the balance after his death. Mary Miller's estate consisted of an equity in her home and there was a net estate of $4,900 in the trust fund for the maintenance of Andrew Miller during his life. Shortly after the death of his wife Miller went to live with the Thomases and was living with them at the time of the trial.

During 1946 decedent was troubled with high blood pressure and a bladder ailment which caused him to be incontinent. Sometime around July 27th of that year deceased fell and injured himself on the porch of the Hasley home where he had a room. A doctor was called who advised Mrs. Hasley that deceased was a sick man and thereafter Dr. Maxson, his regular physician, suggested that he be placed in a nursing home so that he could be properly taken care of. Mrs. Stenicka, wife of one of the objectors of the will, and the Hasleys drove deceased out to the Haven, a rest home in the city of Milwaukee and he ultimately decided to take a room in this home. This is a home with fourteen nurses and four nurses' aid attendants and accommodates about fifty-two patients. Decedent insisted that Mrs. Hasley keep his room for him. At the Haven deceased was put upon a diet calculated to reduce his blood pressure and to alleviate his bladder condition. He found the diet irksome and was dissatisfied with his stay in the home for this reason. In September, 1946, proponents of the will discovered that decedent was at the Haven. There is evidence that decedent had asked the Stenickas to notify the Thomases as to his whereabouts. They did not do this but his landlady, Mrs. Hasley, conveyed the information that de-

cedent wanted to see the Thomases. There is evidence that he told the Thomases how distasteful the Haven was and that he asked them to take him in. Shortly after that, proponents visited decedent and according to their evidence he again urged them to let him room at their place. The next day proponents took decedent out to their home. On the second or third day thereafter Iren Thomas testified that decedent asked to have a lawyer come out to draw a will leaving his property to Iren and Olive Thomas and also stated that he wanted to go to Milwaukee with him to get his papers.

On Saturday, October 12th, Iren Thomas called Mr. Gillett, an attorney, and told him that there was a man at his home who wished to have a will drafted. Gillett told Iren Thomas to come in to his office the following morning. At that time Thomas gave Gillett the information that deceased wanted a will drafted leaving the property to the Thomases. Thomas told Gillett at that time that he wanted a doctor to examine both the deceased and Andrew Miller so as to be apprised of their physical condition and need for medical treatment. Gillett suggested that he have his brother, a doctor, come to the farm the following morning. Gillett drafted the will on the 14th of October and on the 15th he and Dr. Gillett went to the Thomas farm. Dr. Gillett first gave decedent a physical examination. He made certain conclusions as to his illness and also that he was sane and competent. Immediately after the physical examination deceased went into another room and Mr. Gillett conferred with him about his intention to execute a will. At this time Dr. Gillett, proponents, and the lawyer were present. After the decedent said he wanted Iren and Olive Thomas to have the property Mr. Gillett then produced the will which he had prepared, read it to decedent, and the will was executed. Thereafter decedent produced his will of November 28, 1945. Mr. Gillett read the will, directed deceased's attention to the fact that under the new will the beneficiaries of the former will were eliminated. Decedent

said that this was the way he wanted it and tore the will in half, handing the pieces to Mr. Gillett who later destroyed them. The opinion of the scrivener was that decedent was competent and strong willed. The next day decedent asked Iren Thomas to take him to his bank in Milwaukee and on the following day the parties went to the bank where decedent had a safety-deposit box. Decedent closed out his checking account by giving the bank a check for $3,314.98 and withdrew the contents of his safety-deposit box consisting of building and loan stock. The next day Iren Thomas asked deceased where he wished to deposit the cashier's check, whereupon deceased indorsed it, gave it to Iren Thomas and said, "This is your money." At the same time deceased offered to turn over the building and loan stock which constituted the balance of his estate but for some reason this was not done. For a short period after the 15th of October deceased appears to have somewhat improved in health and spirits but he died on October 27th as a result of a sudden aggravation of his bladder condition.

The trial court was of the view that there was clearly an opportunity to exercise undue influence and this is so obviously true that no effort will be made to discuss it. The court indicates in its memorandum that there is strong evidence of the fact that Iren Thomas was of a grasping nature financially and that his acceptance from testator during the last weeks of the latter's life of considerable sums of money indicated that he did not follow "the finest theory of ethics and is certainly a strong point in determining whether or not he had a disposition to influence the deceased improperly." The court was in doubt whether the will was a natural one. He indicated that except for Sally Helmle who was the proprietor of the Haven he found no disposition of witnesses on either side to be untruthful. There was an incident concerning the return of $125 belonging to deceased which was on deposit with her when he left the Haven and in respect of which

the trial judge considered that Mrs. Helmle had not told the truth. Apparently no credence was given to her testimony which was consistently adverse to proponents but not in our view decisive of the issues. There is, indeed, no essential conflict in the evidence except as to opinions concerning the mental and physical condition of the decedent at times important to this case. It is evident from the medical evidence that he was in extremely bad health; that he had arteriosclerosis, bladder difficulties, high blood pressure, and some degree of the senility commonly associated with these conditions and with advanced years. He was in fact actually in his last illness when he went to the Haven. He had been a frugal, independent, and strong-willed person up to that time but the evidence is clear that he could not accommodate himself to the discipline necessary to alleviate his illness. The witnesses agree that he was unwilling to subject himself to the prescribed medical diet and that he was eager to leave the Haven and to escape medical prescriptions and supervision. It is evident that due to this, as well as to his advanced age and his senility, he was prepared to do almost anything to accomplish this end. We are of the view that if these circumstances are not enough to show his susceptibility to undue influence it would certainly take very little additional evidence to establish this as a fact.

Up to the time that decedent went to the Thomas home his previous wills had shown a clear, definite purpose to take care of his three sisters by dividing his entire estate among them. After the death in close succession of two of his sisters he immediately drafted a new will leaving all of his property with the exception of a small legacy to the remaining sister. This plan had been in existence since 1926 and there had been no departure from it during all of this time. He was on friendly terms with Mr. and Mrs. Thomas but the relationship was not one of great intimacy. At the time he made the will that is in question his relations with his surviving sister had not

changed in any way and there had been no break in his purpose to leave his property to her. She remained the natural object of his affection and bounty. He had been at the Thomas home for a few days only when a new will was executed leaving all of the property to Mr. and Mrs. Thomas. This sudden and unexplained change was regarded by this court in *Will of Stanley*, 226 Wis. 354, 276 N. W. 353, as a highly significant fact. It is difficult to repel the inference that something extraordinary had happened to induce decedent within such a short time to change a well-conceived and long-held plan relating to the disposition of his property, and it is more than a coincidence that this occurred as soon as he came to live with Mr. and Mrs. Thomas. The decedent did not consult or select a lawyer. Mr. Thomas not only did this but left directions as to the contents of the will with the lawyer and the will as now presented for probate was drawn not as a result of consultation with decedent. Whatever consultation decedent had with the draftsman of the will was in the presence of the proponents and only after the will was fully executed did decedent produce his old will and destroy it. Within a few days after this, decedent turned over to Mr. Thomas literally all of his cash and offered to transfer his stock although this transaction, for some reason not entirely clear, did not take place. Within two weeks of the execution of the will decedent died.

The result of this was that decedent, almost immediately upon coming to the Thomas home and before he had received any services of value from the Thomases, virtually pauperized himself without exacting any agreement on the part of proponents to take care of him for the rest of his life or, indeed, to perform any other service useful to him. We have already commented upon the bearing of such circumstances upon a disposition to exercise undue influence in *Will of Raasch*, 230 Wis. 548, 284 N. W. 571. We are persuaded that the foregoing facts lead inevitably to a pattern of inferences decisive of this case. The opportunity to exercise undue influence is

conceded, and the circumstances above detailed point so strongly to a disposition to exercise it and to a result indicating its exercise that we must regard findings to the contrary as against the great weight and clear preponderance of the evidence. Three of the elements of undue influence being in our judgment established by the weight of the evidence, only slight evidence of testator's susceptibility to undue influence is required under the rule of our cases and we consider that the evidence as to his susceptibility would at least support an affirmative finding.

It is argued that the trial court, as it had a right to do, rejected the evidence of Mrs. Helmle who is superintendent of the Haven and that this militates against the foregoing conclusions. From Mrs. Helmle's testimony it appears deceased had had communications from his sister while at the Haven, that he had expressed concern about her, and that he had stated his intention to leave all of his property to her. Her testimony was also to the effect that deceased's mental condition while at the Haven was not good; that it tended to deteriorate and that the Thomases on the occasion when they had taken him out riding had given him food and drink contrary to his prescribed diet. Doubtless this testimony, if given credence, would fortify our conclusions. Its force, however, is cumulative and its absence does not in our view impair the inferences which we draw from testimony regarded as believable by the trial court. We hold that the findings of the trial court are against the great weight and clear preponderance of the evidence and that the order should be reversed.

*By the Court.*—The original mandate of this court is vacated. The order of the county court admitting will of October 15, 1946, to probate is reversed and the cause is remanded with directions to enter an order denying probate to this will.

Fritz, J., dissents.