In re Estate of Christen: Bethesda Church, proponent of the August 22, 1973 will of Mary Christen, deceased, Appellant, v. Menning, and others, objectors, Respondents.

*No. 746 (1974). Argued March 2, 1976.—*
*Decided March 18, 1976.*
(Also reported in 239 N. W. 2d 528.)

For the appellant there was a brief by *Carroll E. Metzner, Earl H. Hazeltine* and *Aberg, Bell, Blake & Metzner, S. C.* of Madison, and oral argument by *Carroll E. Metzner.*

For the respondent there was a brief by *Hamilton & Mueller* of Dodgeville, and *James L. Schmitt* of Verona, and oral argument by *Frank D. Hamilton.*

HANLEY, J.  Three issues are presented on this appeal:

1. Does the dead man's statute, sec. 885.16, Stats., also bar testimony of the spouse of a witness who is incompetent to testify under its limitations?

2. Is the trial court's finding of undue influence against the great weight and clear preponderance of the evidence?

3. Should the unsuccessful proponents of this will be awarded reimbursement from the estate for the expenses of the contest?

*Dead man's statute.*

Sec. 885.16, Stats., provides in part:

"No party or person in his own behalf or interest, and no person from, through or under whom a party derives his interest or title, shall be examined as a witness in respect to any transaction or communication by him personally with a deceased or insane person in any civil action or proceeding, in which the opposite party derives his title or sustains his liability to the cause of action from, through or under such deceased or insane person. . . ."

Fred Theiler, husband of one of the decedent's nieces, testified to various conversations with the decedent. Similar testimony was also received from Mary Schwerin, daughter-in-law of Evelyn Schwerin. Evelyn was a friend of Mary Christen and had been named a general legatee in the three wills executed prior to the one in contest. Bethesda contends that such testimony should have been excluded.

The attempted application of sec. 885.16, Stats., was correctly denied by the trial court. Bethesda sought to extend the statutory incompetency of a witness to the spouse of the witness. The dead man's statute renders a witness incompetent to testify on transactions or conversations with a deceased only when the witness is a party, or is a person from, through or under whom a party derives his interest, or is a person who will be testifying in his own behalf or interest while offering such testimony for a party, and the opposite party derives

his participation in the proceedings from, through or under the deceased. Theiler was neither a party nor a person from, through or under whom his wife (a party) derived her interest. Argument is directed to the provision that renders a witness incompetent when testifying in his own behalf or interest.

A strict interpretation is given the dead man's statute. *Estate of Nale* (1974), 61 Wis. 2d 654, 659, 213 N. W. 2d 552. Although the retention of this statute by the legislature after a clear address to it for action, *see:* Judicial Council Committee's Note, Wisconsin Rules of Evidence sec. 906.01, 59 Wis. 2d Rp. 158, implies approval of its provisions, the interpretation placed on "behalf or interest" in that law is of long existence and also is thus tacitly approved. In *Johnson v. Mielke* (1970), 49 Wis. 2d 60, 181 N. W. 2d 503, it was noted that:

". . . the true test of the disqualifying interest of the witness is whether he will gain or lose by the direct legal operation and effect of the judgment, or that the record will be legal evidence for or against him in some other action. *Will of Williams* (1950), 256 Wis. 338, 350, 41 N. W. 2d 191; *Estate of Novak* (1923), 181 Wis. 16, 18, 193 N. W. 1000." *Id.* at page 74.

*Estate of Novak* also contained the qualification, repeated in *Williams,* that the interest must be present, certain, and vested, and "not an interest uncertain, remote, or contingent."

Prior decisions of our court are illustrative of interests that are too contingent or remote. In *Estate of Komarr* (1975), 68 Wis. 2d 473, 228 N. W. 2d 681, a mother was allowed to testify in a proceeding in which the status of her children as among the heirs of the decedent was in issue. *Estate of Nale, supra,* involved a challenge to the competency of a daughter to testify in support of her mother's claim against the estate. This court found the cited interest also to be too speculative for purposes of

the statute. Also, in *Carlsen v. Hardware Mutual Casualty Company* (1949), 255 Wis. 407, 410, 39 N. W. 2d 442, the contention raised here was rejected under the circumstances of a wife testifying to conversations with the deceased in a personal injury suit against his insurer, brought by her husband.

Bethesda directs attention to the interest a person has in the estate of the spouse through the newer intestacy and election provisions. Secs. 852.01 and 861.05, Stats. The older cases are thus characterized as distinguishable. The wife in *Carlsen* had somewhat equivalent rights. Secs. 318.01, 233.01 and 233.13, Stats. 1947. Current intestate proceedings applied to the daughter in *Estate of Nale*. Although a spouse under our current law has closer interests than in those cases, contingencies still exist and make the interest too remote. Election may be variously barred, sec. 861.07, and the current reception of property may have an immaterial effect on the ultimate estate to which the "interest" applies, even assuming that the "interested" witness survives or remains married to the party. In light of the requirement that the interest be realized (a gain or loss) by the effect and direct legal operation of the judgment on the cause in issue, the interest subject to contingencies cited here is no more persuasive now than in the earlier cases in our state.

*Undue influence.*

The law applicable to this case was summarized in *Estate of Von Ruden* (1972), 55 Wis. 2d 365, 373, 198 N. W. 2d 583:

"In order to void a will because of undue influence, four elements must be proved by clear, satisfactory and convincing evidence:

" '*Susceptibility*—a person who is susceptible of being unduly influenced by the person charged with exercising undue influence.

" *'Opportunity*—the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor.

" *'Disposition*—a disposition on the part of the party charged to influence unduly such susceptible person for the purpose of procuring an improper favor either for himself or another.

" *'Coveted result*—a result caused by, or the effect of, such undue influence. *Will of Freitag* (1960), 9 Wis. 2d 315, 317, 101 N. W. 2d 108.

" ' . . .

" 'The burden is upon the objector to prove by clear, satisfactory and convincing evidence that the will was a result of undue influence. However, in recognition of the difficulty of proving undue influence an additional rule is applicable. When three of the four elements are established by the required proof, only slight evidence as to the fourth element is necessary to prove its existence. *Will of Freitag, supra,* page 318.' *Estate of Brehmer* (1969), 41 Wis. 2d 349, 351, 352, 164 N. W. 2d 318.

". . . In addition, undue influence may be proved independently of the above criteria where a confidential or fiduciary relationship exists between the testator and the beneficiary coupled with the existence of 'suspicious circumstances.' *Estate of Komarr* (1970), 46 Wis. 2d 230, 175 N. W. 2d 473 . . . ."

The finding by the trial court of undue influence is to be sustained unless it is against the great weight and clear preponderance of the evidence. *Will of Freitag, supra,* at pp. 316, 317.

Mrs. Christen resided in the Belleville, Wisconsin area for most of her life. She had lived alone there after the death of her husband in 1961 until she purchased a mobile home in 1970 and moved to the farm of a niece, Mrs. Helen Zurbuchen. Apparently her purpose was to continue in contact with her older sister and brother-in-law, who also resided in a mobile home on their daughter Helen's farm. There was also the suggestion that she hoped to have one of Mrs. Zurbuchen's daughters help her out.

Fred Theiler, brother-in-law of Mrs. Zurbuchen, testified that he would often visit Mary Christen when he brought his own family over to visit his wife's parents and sister. The testatrix had known him and his mother from his days as a young boy in the New Glarus area of Wisconsin, and they would frequently converse in "Swiss" on these visits. Theiler understood that Rev. Peterson visited Mrs. Christen at least once or twice a week while she lived in the trailer. She attended his church for many years, and had provided a bequest to Bethesda in some of her previous wills. Mrs. Christen later had been attending a church near her mobile home in Verona but ceased attendance early in 1972. Theiler stated that the testatrix had shown an interest in "ministries which favored the healing powers," and had confided in him that she believed Rev. Peterson had the power to heal her.

Rev. Peterson himself stated that he believed he took Mrs. Christen to a bank in Belleville about twenty-five times over a period of two or two and a half years, confirming that he had close contact with the testatrix. He also had taken her to a young attorney acquaintance in Madison, who had done some work for him in the past, for the drafting of her last two wills, including the one in contest here. On the day of execution of that will, August 23, 1973, an account was opened in a Madison bank, captioned "Rev. Norman Peterson for Mrs. Mary Christen." Testimony established the withdrawal of funds from her account in a Belleville bank the same day. A few days later, Rev. Peterson contacted an apartment owner in Madison about procuring a residence there for Mrs. Christen. The owner required meeting Mrs. Christen before renting the apartment, and he approved the rental when he met her on the first of September. Rev. Peterson signed for Mrs. Christen, and the owner testified that Peterson said he would be taking care of some things for her.

The trial court chose to utilize the four factor test, rather than the "confidential relationship" test in reaching its ruling of undue influence.

1. *Opportunity.*

Although Bethesda challenges the testimony of the frequency of Rev. Peterson's visits to Mary Christen because it comes from what it calls "interested parties," Peterson himself testified to taking her on at least twenty-five trips to the bank during a period of, at most, two and a half years. The Madison bank account and apartment incidents are further strong circumstantial evidence of a prior close contact that would enable opportunity for influence in other areas.

2. *Susceptibility.*

It is undisputed that Mary Christen was devoutly religious. Testimony of Fred Theiler indicates that she was also growing more apprehensive about death. Testimony of those who knew her throughout her life indicated that she was physically failing throughout 1973. Eccentric behavior and conversation, unlike her previous actions, also became evident during that time. The trial court found that under such circumstances the testatrix would be susceptible to the influence and advice of a minister with whom she had frequent contact.

Although conceding the existence of physical deterioration during 1973, Bethesda disputes the existence of mental failing. The positive testimony of the will drafter on her competency is difficult to resolve with the contrary testimony of numerous people who observed evidence of weakened lucidity. The question of credibility was for the trier of fact.

The trial court was correct in expressing that "the truth probably lies somewhere between the extremes," and that the behavior witnessed by friends and relatives, whether interested or disinterested as Bethesda used the terms, was not of such a consistent nature as to be ob-

served in the brief contacts with the will drafter, his secretary, and the landlord of the Madison apartment. The latter only saw her the few times when he collected rent. He did believe her to be capable of caring for herself, although he noted that Peterson signed the lease and mentioned that he would be "taking care of things." A bank teller and bank officer who were acquainted with her noted some evidence of mental lapse during this same period.

Of key importance is the will drafter's testimony that Mrs. Christen made the will because of the efforts of her relatives to convert her to a different religion and because she felt they were only interested in her money. The religious aspect in fact does not seem true, because the member of that particular sect had been eliminated by the previous will, even though she had been given a specific bequest and had been in the residuary class of previous wills. Bethesda seeks to implicate this religious objection to the entire residuary class.

Much stress is laid on the testimony of attorney Edward Willi, an acquaintance of Mrs. Christen and her deceased husband. In 1967, he had drafted a document detailing her request that a certain bank be named guardian if such became necessary, and requesting that a designated relative, who was excluded from her will, be retained to care for her in her home. The document recited that she had no immediate family. Willi noted that she was very much opposed to the idea of guardianship. Although this may indicate some distrust of her relatives as a group, it is noteworthy that she still made them the overwhelming bulk of her beneficiaries in the wills executed at that time and five years later.

Mary Christen's late willingness to have Rev. Peterson as a frequent visitor, to rely upon him for transportation, to utilize his attorney instead of her long time legal counsel and to allow the Rev. Peterson to take over her

financial affairs in the manner he did indicates she became very dependent upon him. Such dependence did make her susceptible to his influence during the summer of 1973.

3. *Coveted result.*

The 1973 will abruptly discarded all specific bequests and the entire residuary class in favor of Bethesda. Some of these specific bequests to nieces and nephews had appeared as early as 1961, while others arose in 1967. Bethesda appeared as a beneficiary for a few months in 1967 and reappeared in a 1972 will drafted by the acquaintance of Rev. Peterson. There was evidence of Mrs. Christen's unhappiness with Peterson in that interval. Although the reinstated grant arouses no strong suspicion because of its size, a subsequent rejection of a long standing structure in favor of one asserted as having dominance on the decedent is strong evidence of a coveted result. *Will of Klofanda* (1949), 254 Wis. 186, 192, 36 N. W. 2d 71. The usual concern of this court on the subject of "coveted result" is with the naturalness or expectedness of the bequest. "Whether a will is unnatural, however, must be determined from a consideration of all the surrounding circumstances." *Estate of Von Ruden, supra,* at pages 375, 376.

The relative active in a religious persuasion distasteful to Mrs. Christen had been removed from the residuary class in a previous will. Bethesda points out that Attorney Willi and the will drafter made mention of Mrs. Christen's statements of distrust or cooled feelings toward her relatives. The statements respectively occurred at the drafting of the will attacked as being the product of undue influence and a few months later, at which later time a guardianship was being discussed among them and Attorney Willi. Similar statements were alleged as having been made at the drafting of the previous will, yet the nieces and nephews were still retained

as beneficiaries. Bethesda also explains the testimony of the increasingly unkempt dressing and household habits of Mrs. Christen as indicative of "abandonment" by her relatives, which is claimed not to be refuted by the record. This contention merely points out that the residuary class of most of her nieces and nephews were no more competent than Rev. Peterson to testify on their transactions with her because of sec. 885.16, Stats. A sister-in-law testified that other relatives also visited Mrs. Christen in 1973 in addition to Fred Theiler's testimony of his contacts with her. It appears that Mrs. Christen's disaffection with her nieces and nephews coincided with her failing condition and the renewed influence of Rev. Peterson rather than being based on the acts of the relatives themselves. The exclusion of all of her previous beneficiaries, blood relatives, is unnatural under the circumstances.

4. *Disposition.*

The trial court noted that the previous three elements were established by clear and convincing evidence, but that only a lesser quantum of proof could be found to be supportive of this element. As indicated earlier, this balance of evidence is still sufficient to establish undue influence.

This element "implies a willingness to do something wrong or unfair, and grasping or overreaching characteristics," *Estate of Brehmer, supra,* at page 356, or to bring about a "result favorable to himself and unjust to another," *Will of Schaefer* (1932), 207 Wis. 404, 415, 241 N. W. 382.

In finding evidence to suggest a disposition to undue influence, the trial court first reviewed the evolution of the bequest to Bethesda through the prior wills. It further concluded:

"For a minister to spend a large amount of time with one elderly parishioner and to be willing to transport

her on errands is commendable. To transport her to his attorney for the purpose of making a new will is suspect. Then, after the last will, for a minister to assume control over the person and property of that parishioner, to move her to an east side apartment [near his church] away from her relatives, to sign the lease, to open an account for her in his name and to express unusual interest in sequestering her funds there indicates a disposition to protect the legacy his church was to obtain under the will."

Although some of these incidents occurred after the execution of the will, they are indicative of an established pattern of influence and disposition. As a general proposition, undue influence must operate at the time the will is executed. *Estate of Elvers* (1970), 48 Wis. 2d 17, 21, 179 N. W. 2d 881. Occurrences in temporal proximity of the will execution are strong circumstantial evidence of the relationship between the testatrix and her spiritual advisor.

Bethesda argues that the allegation that Mrs. Christen's move to Madison was secretive is ludicrous. The gist of the argument concerns the subsequent removal and sale of the mobile home by Rev. Peterson. Obviously this after-the-fact disposition of the trailer does not remove the cloud of suspicion generated by the move of Mrs. Christen without any acknowledgment made to any relatives. Some were contacted by her later and only then were all informed.

Finally, Bethesda explains the bank account in Peterson's name and the certificates of deposit in his possession as merely being protection for emergencies. This argument is premised on a further argument that, as in the case of her moving, Mary Christen's relatives would not assist her in any way. There is testimony to the contrary. Bethesda argues that if Rev. Peterson was inspired by evil motives, he would have left Mrs. Christen at her trailer rather than call attention to his influence;

there is no implication in a charge of undue influence, however, that he did not have real concern for her.

As the trial court noted:

"Options far less suspicious were available to Reverend Peterson if he was not disposed to exercising his influence over Mary Christen; her lifelong attorney could have been used to prepare the will; close relatives and friends could have been contacted by him to provide the personal assistance she needed; someone other than himself could have been sought to assist her with her financial affairs."

Even assuming that Mrs. Christen had formed a distrust of her relatives on her own, a minister would seem more properly advised to discover the nature of this distrust and determine if there were facts supporting it, and then act to reconcile such differences amongst the family rather than exacerbate the division by moving his parishioner away and by assuming to act as her guardian to his advantage.

His contacts with others, in the course of this "guardianship," should have indicated as much to him. A teller at one of the banks patronized by Mrs. Christen testified to a withdrawal during mid-September where the decedent appeared distracted and had difficulty conveying her wishes. That teller subsequently received calls from Rev. Peterson, apparently in inquiry of when certain certificates of deposit could be withdrawn, which she transferred to an officer of the bank. That officer testified to informing Peterson that he could not disclose that information to someone whose only authority was that he was purporting to "take care" of Mrs. Christen; legal documentation to that effect was required. The officer testified that Mrs. Christen then was put on the telephone and that he had difficulty in discerning what she wanted. At times during the conversation she would not respond or would giggle, and once replied that she was going to use the money to "get married."

We conclude that the trial court's determination on the four elements, made in assessment of the credibility and accuracy of the relevant testimony, is not contrary to the great weight and clear preponderance of evidence.

*Contest expense.*

Sections 879.35 and 879.37, Stats., provide for costs and attorney fees in will contests for the unsuccessful proponent of a will "if he is named as an executor therein and propounded the document in good faith."

A local bank was named executor in all of the wills of testatrix. Bethesda asserts the "equitable circumstances" doctrine as allowing it such reimbursement although it is not the party so permitted by statute. This doctrine, followed in *Estate of Sheldon* (1946), 249 Wis. 430, 24 N. W. 2d 875, and *Estate of Hoyt* (1963), 22 Wis. 2d 209, 125 N. W. 2d 350 concerned conflicts of will interpretation and claims against the estate which the executor would be expected to deal with. In those cases the executors were faced with a conflict of interest and beneficiaries were allowed to assume the position of executor and receive his reimbursement. They are not applicable to the specific statutes involved here. In *Estate of Connolly* (1974), 65 Wis. 2d 440, 222 N. W. 2d 885 this court stated:

"The appellant here was not a successful litigant, either in this court or the trial court, nor was he named executor in the will admitted to probate or any other will of Nellie Connolly. He is not, therefore, legally eligible to an award of his costs and attorney's fees from the corpus of the estate." *Id.* at page 458.

Even if the "equitable circumstances" doctrine could be applied to Bethesda's statutory deficiency of not being an executor, there is a lack of qualification under the second criteria of "good faith." Bethesda acknowledges that the "undue influence" ground of objection to a will is a form of fraud, and a finding of undue influence on the part of an agent of Bethesda certainly disqualifies it from asserting "good faith" under the statutes.

We conclude the will cannot be admitted to probate as a valid last will and testament of Mrs. Mary Christen.

*By the Court.*—Orders affirmed.