IN MATTER OF ESTATE OF Julia Smith SENSENBRENNER, Deceased: F. James SENSENBRENNER, Appellant, v. John S. SENSENBRENNER, and others, Respondents.

Supreme Court

*No. 76–571. Argued April 30, 1979.—*
*Decided May 30, 1979.*
(Also reported in 278 N.W.2d 887.)

680

For the appellant there were briefs by *Harrold J. McComas, Wayne R. Lueders, Mark G. Petri* and *Foley & Lardner* of Milwaukee, and oral argument by *Mr. Mc-Comas.*

For the respondents there were briefs by *Laurence C. Hammond, Jr., David L. Kinnamon, Gerald H. Engeleiter* and *Quarles & Brady* of Milwaukee, and oral argument by *Mr. Hammond.*

COFFEY, J.   Julia Smith Sensenbrenner (hereinafter Julia) died on April 10, 1974 at the age of 81 years, survived by her natural son, John S. Sensenbrenner, Jr. (hereinafter John) and her three step-children: F. James Sensenbrenner, Sr. (hereinafter James), Gretchen Sensenbrenner Carney and Helen Mary Sensenbrenner Mc-

Murtie. Julia Smith married Colonel John S. Sensenbrenner, Sr. (hereinafter the Colonel) in 1923 following his divorce and they lived together until his death on October 8, 1973. John is the only issue of this marriage. A petition for probate of Julia's will and last testament executed on November 1, 1973 was filed in the probate court of Winnebago County on April 15, 1974. In the new will of 1973 she rescinded the provisions in her and her husband's prior wills providing for a percentage distribution of assets to John and her three step-children. Julia's last will, revoking her 1959 will and codicils, left her entire estate to her natural child, John. As a result of this change in the distribution of assets, James filed an objection to the will on May 30, 1974; the testatrix's stepdaughters (Gretchen Sensenbrenner Carney and Helen Mary Sensenbrenner McMurtie) have not joined in his objection.

The principal controversy in this will contest centers upon the fact that the 1973 will leaving Julia's entire estate to John abandoned a prior estate (15 years) plan that was identical to her husband's testamentary intentions in the creation of their marital deduction trust. The Colonel's will provided that approximately one-half of his stock holdings in the Kimberly-Clark Corp. were to be placed in a marital deduction trust allowing his wife, Julia, to exercise an unrestricted power of appointment over the assets upon his death. In the event Julia predeceased him, the Colonel's will provided for the following residuary disposition of the marital trust assets: John, Jr., 33¾%; F. James, 28¾%; Gretchen, 18¾% and Helen Mary, 18¾%. In Julia's prior will of December 23, 1959 she created separate trusts for the benefit of her son, John, and the three step-children, applying the same percentages for the distribution of the marital trust assets. However, her 1959 will also provided that her

solely owned assets consisting of stock in the Menasha Woodenware Co.[1] were bequeathed to John.

At the hearing on the objection to Julia's final will, James, the appellant-objector, sought to establish that John had exercised undue influence through the alleged procurement of legal and accounting services used in the drafting of the 1973 will. There is no dispute in the record that on October 12, 1973 John personally contacted Robert Regner, an accountant with Arthur Anderson, Inc., and retained him to render tax advice in the preparation of Julia's estate plan. However, there is conflicting evidence as to whether John also procured the scrivener of his mother's last will. The accountant testified that John informed him that he had spoken to Atty. F. Joseph Sensenbrenner concerning the revision of his mother's will.

Atty. Sensenbrenner testified that Julia personally retained him in a telephone call on October 11th requesting him to draft some changes in her will. The attorney met with her the same afternoon and her first request was that John Dempsey, for whom she had a long-standing dislike, be removed as the probating attorney and personal representative for her and her husband's estates. Although Dempsey had prepared Julia's and her husband's prior wills and estate programs, she had never initiated any of the contacts with him. During her husband's life, she relied exclusively on the Colonel for his judgment and advice as to the necessity for any changes in her will or estate plan.

Atty. Sensenbrenner testified that after he had prepared the codicil removing Atty. Dempsey as a fiduciary, on October 16, 1973 Julia requested that he draft a new will for her, leaving everything to John, including any property she would receive from her husband's estate. The appellant-objector contends that Atty. Sensenbrenner

---

[1] A Smith family personal holding company.

and John met and discussed the substance of Julia's new will prior to its execution on November 1, 1973. Atty. Sensenbrenner and John denied the allegation that they were together at Julia's home discussing the will during this time period. However, the attorney testified that after Julia requested that he draft a new will, he contacted John asking him for a copy of his father's will in order that he might review and examine the same concerning the marital trust as it related to the will he was then preparing for Julia.

Atty. Sensenbrenner scheduled the will execution for 11:00 a.m. on November 1, 1973, but was unable to secure the witnesses for that morning. He rescheduled the will signing for 5:00 p.m. on the same day and was accompanied at this meeting by Arthur Remley, his law partner who had rendered advice in the drafting of Julia's will. Julia was presented with a copy of the new will and read the document's provisions with counsel. During the discussion of the will with Julia, Remley intervened and explained the provisions dealing with her exercise of her power of appointment over the marital trust. He explained this provision and pointed out specifically that John would receive the entire trust assets upon Julia's death. The attorney testified that after completing his reading and explanation of the power of appointment bequest, Julia announced her approval stating, "That's what I want." While the meeting was in progress, John arrived at his mother's home and she requested him to enter the room while the will was being discussed and reviewed. Remley further testified that upon completing the explanation and review of the will, Julia indicated her satisfaction and signed the will in the presence of the two attorneys. He also stated that Julia appeared attentive during the signing and that he perceived no noticeable change in her dominant personality on that day, November 1, 1973.

The following day, Julia personally delivered the new will to Agnes Mullen, the Colonel's personal secretary of 27 years. Julia directed Mrs. Mullen to file the new will in a safe place and destroy her 1959 will and all codicils. Shortly after Thanksgiving, 1973, Julia and Mrs. Mullen left for their annual winter vacation. Some two weeks after Julia's return from her winter vacation in Florida without ever further discussing the new will with Mrs. Mullen, she died on April 10, 1974 from congestive heart failure.

While on the witness stand, Mrs. Mullen established the existence of the close relationship between John and his mother and pointed out that John was a devoted and thoughtful son who visited his parents almost daily. Further, the personal secretary stated that John's three children were the "apple of Julia's eye" and that she and the Colonel would frequently visit their grandchildren at John's home. In contrast, Mrs. Mullen testified that Julia often expressed a dislike for her step-son, James. This was amplified with the explanation that when the Colonel visited James and his family in either their Milwaukee or Florida homes, he was not accompanied by his wife, Julia. She also noted in her testimony that Gretchen and Helen Mary, the daughters of the Colonel's first marriage, had little or no contact with their step-mother as they believed Julia had usurped their mother's position in the family.

The trial court, in its findings of fact and conclusions of law, determined that the objector to the will did not meet the clear, satisfactory and convincing burden of proof required to establish his contentions of undue influence and ordered the will of Julia Smith Sensenbrenner, dated November 1, 1973, admitted to probate.

*Issue:*

Whether pursuant to the "confidential relationship—suspicious circumstances test," is there sufficient credible

evidence to sustain the trial court's findings of fact and conclusions of law that the deceased, Julia Smith Sensenbrenner's, Last Will and Testament of November 1, 1973 was not the product of undue influence?

The appellant-objector, James, challenges the validity of the will in question alleging that its sole beneficiary, John, exercised undue influence upon the testatrix. A will's validity is presumed with proof that the will has been duly executed. *In re Estate of Malnar,* 73 Wis.2d 192, 199, 243 N.W.2d 435 (1975). However, the presumption of the will's validity can be overcome if undue influence is proven by clear, satisfactory and convincing evidence. *Estate of Hamm,* 67 Wis.2d 279, 282, 227 N.W. 2d 34 (1975); *Estate of Von Ruden,* 55 Wis.2d 365, 373, 198 N.W.2d 583 (1972); *Estate of Velk,* 53 Wis.2d 500, 192 N.W.2d 844 (1972) *Will of Cooper,* 28 Wis.2d 391, 137 N.W.2d 93 (1965). *Will of Faulks,* 246 Wis. 319, 17 N.W.2d 423 (1945) recites the reason for the higher burden of proof required to establish an allegation of undue influence:

"In this state undue influence is considered as a species of fraud and must be established by clear, convincing, and satisfactory evidence. See also *Will of Boardman* (1922), 178 Wis. 517, 190 N.W. 355; *Will of Emerson* (1924), 183 Wis. 437, 198 N.W. 441; *Will of Grosse* (1932), 208 Wis. 473, 243 N.W. 465." *Id.* at 344.

In *Estate of Steffke,* 48 Wis.2d 45, 179 N.W.2d 846 (1970), undue influence was defined in the following language:

"A person has a right to dispose of his worldly goods as he wishes providing those are his wishes. All people are motivated and should have reasons to act, but in undue-influence cases the influence must be undue and overreaching of the testator's mind causing him to act as the influencer intends." *Id.* at 50.

In every case where it is argued that the contested will is a product of undue influence "[T]he basic question which must be determined from the evidence submitted is always whether 'the free agency of the testator has been destroyed.' *Will of Faulks, supra,* page 359." *Estate of Hamm, supra* at 294–95.[2]

There are two traditional methods of challenging the admission of a will to probate on the theory of undue influence:

"*One* is by proving the elements that this court has said show undue influence. Those are: (1) susceptibility to undue influence, (2) opportunity to influence, (3) disposition to influence, and (4) coveted result . . .

"*The second method* of challenge is to prove the existence of (1) a confidential relationship between the testator and the favored beneficiary and (2) suspicious circumstances surrounding the making of the will. . . ." *In re Estate of Kamesar,* 81 Wis.2d 151, 158–59, 259 N.W.2d 733 (1977). (emphasis supplied).

James, the objector, presented his case to the trial court under each of the two theories recited above for proving undue influence. However, on appeal, the objector confines his argument to the two-element "confidential relationship-suspicious circumstances" test contending the trial court erred in failing to find: (1) the existence of a confidential relationship between the testatrix and her son, John, the sole beneficiary under her November 1,

---

[2] In *Ball v. Boston,* 153 Wis. 27, 38, 141 N.W. 8 (1913) the court described the destruction of "free agency" as leaving the testator:

"The . . . powerless victim of the purpose effected by 'that subtle species of fraud'—where such helplessness to resist direct or indirect suggestion is produced by 'insidious approaches, seductive artifices, or other species of circumvention.' Undue influence is the very antithesis of right influence. It exists only where there is practical destruction of voluntary volition, . . ."

1973 will and (2) the existence of suspicious circum-
stances surrounding the making of the will.

■

The appellant-objector contends a rebuttable presump-
tion of undue influence was created with the introduction
of facts concerning a confidential relationship coupled
with suspicious circumstances. It is further argued that
because the trial judge did not recite in his findings of
fact his consideration of the presumption of undue in-
fluence arising from the evidence submitted, this court
should not accord the trial court's findings of fact the
weight usually given to such findings. The well-estab-
lished standard of review applied to a case of undue
influence is that a trial court's findings of fact will not
be upset on appeal unless it is against the great weight
and clear preponderance of the evidence. *In re Estate
of Malnar, supra* at 282.

■

In *In re Estate of Fechter*, 88 Wis.2d 199, 219 (1979)
the court detailed the procedural framework underlying
the presumption of undue influence:

"Undue influence may also be proved by the existence
of a confidential relationship between the testator and
the one alleged to have exercised undue influence, and
suspicious circumstance surrounding the making of the
will. When the objector proves the existence of both
elements by clear and satisfactory evidence, a rebuttable
presumption of undue influence is raised. The burden of
going forward with the evidence then shifts to the pro-
ponent of the will. If rebutting testimony is introduced
the inference still persists, but a trier of the facts is not
required to accept the inference and may reject it and
accept the rebutting evidence. However, one need not
contradict the evidentiary facts giving rise to the infer-
ence but may introduce such facts as would permit the
rejection of the inference of undue influence." [footnotes
omitted.] *Id.* at 219.

Thus, *Fechter* delineates two methods by which a will's proponent can destroy the presumption of undue influence. First, the party may contradict the evidentiary facts creating the presumption and destroy the clear, satisfactory and convincing weight of the evidence. The second method is that although the rebutting evidence does not directly contradict the evidentiary facts underlying the presumption of undue influence, the presumption may be overcome with the introduction of sufficient facts to permit its rejection.

In the present case, the trial court found neither a confidential relationship nor suspicious circumstances. The trial court rejected the appellant's allegations of undue influence finding the testimony did not meet the standard for proving undue influence by clear, satisfactory and convincing evidence. Therefore, we review the trial court's findings rejecting the existence of either a confidential relationship or suspicious circumstances and these findings will be sustained unless contrary to the great weight and clear preponderance of the evidence standard.

*The Existence of a Confidential Relationship*

The trial judge found that the appellant had not produced sufficient evidence to establish a confidential relationship between John and his mother. He reasoned that the ofttime unique and close relationship between a mother and son is entirely different from that of an attorney-client, physician-patient, priest-parishioner relationship and should not be compared to the undue influence exercised by a nonrelative in the drafting and execution of a will.

In *Will of Faulks, supra* at 358 the court stated the following as to whether family-relationships can constitute a confidential relationship:

"The relations of attorney and client, physician and patient, priest and parishioner, and some others are ordinarily referred to as being of a confidential and personal nature. The rules applicable to these relationships do not ordinarily extend to the relation of parent and child or husband and wife. It is generally held that the existence of confidential relations between the testator and favored beneficiary standing alone, do not necessarily constitute undue influence although it may cause the court to examine the case with greater scrutiny and may, when coupled with other circumstances, raise a presumption of undue influence, but the question must be determined, as in all other cases, by ascertaining whether the free agency of the testator has been destroyed." 68 C.J. p. 751, sec. 442, and cases cited; 28 R.C.L. p. 146, sec. 100; 1 Page, Wills (2d ed.), p. 1230, sec. 720.

The language in the passage quoted from *Faulks* does not exclude the possibility that under certain circumstances a child can serve in a confidential relationship to his parent. This position is supported in *Page on Wills*, Vol. 3, sec. 29.87 (3d ed. 1961) which recites:

"The fact that the testator makes a will in favor of his child does not, of itself, create any presumption of undue influence. This is said to be due to the fact that it is presumed that the parents dominate their children, rather than that children dominate their parents. It is said that no presumption can exist unless it is shown that the child is the dominant spirit, or that special trust and confidence is reposed in the child.

"...
"If a child of testator is also his confidential agent the rule of presumption with reference to confidential agents applies, and not the rule with reference to parent and child, and a presumption of undue influence arises if such confidential agent receives especial benefit under the will. The practical difficulty in applying this principle arises out of the difficulty in determining the point at which the amount and kind of assistance which a child renders to its parent makes the child a confidential ad-

visor. The fact that the child has transacted business for its parent does not raise a presumption of undue influence, nor does the fact that the child lived with its parents and managed their property for them. . . ."

Further, the holdings in the *Estate of Velk, supra* at 507–08 and the *Estate of Steffke, supra* at 51 should be considered in light of the appellant's claims and the conflicting testimony that John exercised undue influence by obtaining the scrivener for Julia's last will. *Velk* and *Steffke* hold that a beneficiary who procures the drafting attorney will stand in a confidential relationship to the testator.

There is conflicting evidence as to who specifically procured or directed the procurement of Atty. Sensenbrenner. The will objector argues that the testimony of Robert Regner, quoted below, supports his contention that John procured Atty. Sensenbrenner, the scrivener of the November, 1973 will. However, from this testimony it can also be argued that John merely talked to Atty. Sensenbrenner after his mother had retained the attorney to redraft her will. Robert Regner, a partner in Arthur Anderson, Inc., testified that on October 12, 1973 John called to inform him that his father had died and further:

"John stated that he has already talked to [Atty.] Joe Sensenbrenner about revising his mother's will. Apparently his mother will receive one-half of his father's stocks, approximately $8,000,000 worth. We will be working with Joe Sensenbrenner in estate planning for John's mother."

Regner explained that during the next several months following the October 12th contact with John he had no direct communication with Julia while preparing various tax studies for her estate planning. Regner's records indicated that on October 12, 22, 23 and November 12 and 13th he conferred with John and during these com-

munications Regner was instructed to study the gift and estate tax implications pertaining to: (1) gifts to John and his children of Julia's One and One-half Million Dollar holdings in the Menasha Woodenware Co.; (2) the use of Estate Tax Flower Bonds;[3] (3) the tax advantages of using a minority trust rather than an outright gift to John's children. Further, on March 18, 1974 Regner was again contacted as John was interested in the tax advantages between receiving his mother's estate outright or in trust.

In contrast, Atty. Sensenbrenner testified that on October 11, 1973 Julia personally telephoned him and asked him to redraft and make certain changes in her 1959 will and codicils. Thus, with this testimony, the attorney unequivocally denied that John, the beneficiary of the 1973 will, had anything to do with retaining him and initiating the first meeting between Julia and himself. Atty. Sensenbrenner stated that Julia's first priority for a change in the will was to remove John Dempsey as her personal representative and probating attorney, as she had a strong dislike for her husband's life-long friend and estate planner. On October 16, 1973, as Atty. Sensenbrenner was presenting Julia with the newly drafted

---

[3] CCH, Federal Estate and Gift Tax Reporter, par. 9764.05 offers this explanation of a "Flower Bond":

"Certain issues of Treasury bonds (also known as 'flower bonds') are redeemable at par and accrued interest upon the death of the owner, at the option of the representative of, or, if none, the persons entitled to, his estate, for the purpose of having the entire proceeds applied in payment of the Federal estate taxes on the decedent's estate . . . . Where a bond is acceptable in payment of estate taxes, it must be valued in the gross estate at par value (including interest accrued to date of death) to the extent that it is redeemable in payment of estate taxes. This is true even though the bonds are not so used (Rev. Rul. 69–489, 1969–2 CB 172).

The record indicates that John purchased $800,000 worth of Estate Tax Flower Bonds on behalf of his mother.

codicil removing Dempsey as a fiduciary, Julia directed him to draft a new will. The scrivener, in his testimony, explained that Julia wanted a plain, simple will leaving everything to John, including any and all assets received from her husband's estate.

John confirmed the attorney's testimony in denying that he had procured the services of Atty. Sensenbrenner and further his recollection was that he had told Regner that in fact Julia had retained the service of the attorney. The following excerpt from the testimony explains John's participation in his mother's estate planning following his father's death:

"*Q.* Now, after your father died, did you talk to your mother at any time about estate planning?

"*The Witness:* Yes, I did.

"*Q.* When?

"*A.* I would say beginning within a few days after my father's death, and probably continuing until she went to Florida at the end of November, I would think.

"*Q.* . . . How did it arise, if you discussed it with her?

"*A.* Well, I think it arose that I felt with my father gone, and as far as I knew, he was my mother's prime contact as far as estate planning or discussions of that type were concerned, I felt somewhat—well, I felt a definite obligation to step in and talk about these things with my mother, an obligation I guess to try to do whatever I could in this regard, to assist or direct or see what her idea was or whatever assistance I could be.

"*Q.* How did it come about so far as you know, how did you become aware of the fact that your mother had discussed estate planning with Joe Sensenbrenner?

". . .

"*The Witness:* My wife told me that my mother had told her that she did not intend to retain John Dempsey as her attorney. So, as I recall, on my next visit I asked my mother if that was correct, if that was true; and she said, yes, that she had retained Joe Sensenbrenner as her attorney, or words to that effect.

"*Q.* And after that did you have any other discussions with your mother about estate planning prior to, let's take it prior to November 1, 1973?

"*A.* Yes, I believe I did.

"*Q.* What did you say to your mother on those occasions?

"*A.* Well, we talked about the matter of gift giving to my children, in the interest of by-passing a generation with those gifts. We may have also discussed gifts to me and/or my wife; and after I learned she had retained Joe Sensenbrenner, or perhaps even before, I talked about the possibility of leaving some property through her will to my children, and also to my wife."

The following excerpts from the testimony further illustrate the nature of the assistance John rendered to his mother and at her direction:

"*Q.* Now, have you recited all the conversations and your recollection of all the conversations you had with your mother that you recall between October 8th and November 1, 1973, that had anything to do with gift programs or will provisions?

"*A.* I had one conversation that I, or perhaps two, that I alluded to, but I'm not sure I covered them in detail or specific about it. This is in regard to the gift giving program, and after I received the October 24th letter from Arthur Anderson concerning that gift giving program I discussed this letter with my mother.

"*Q.* What did you say to her, and what did she say to you?

"*A.* She said this is very complicated, or words to that effect, and asked if I had covered this letter with Joe Sensenbrenner.

"*Q.* What did you say?

"*A.* I said, no, I had not.

"*Q.* What did she say, if anything?

"*A.* She said, talk to Joe about it, or words to that effect, and let me know what he says.

"*Q.* Did you talk to Joe Sensenbrenner?

"*A.* My recollection is, yes, that I did.

"*Q.* Do you recall anything that was said?

"*A.* I don't. Afraid I don't.

"Q. Do you recall whether or not he told you that he disagreed?

"A. I don't believe he told me that he disagreed, no.

"Q. . . . Did you then talk to your mother again?

"A. After the conversation with Joe?

"Q. Yes.

"A. Yes, I did.

"Q. And what was that conversation?

"A. Again, I don't recall the specifics of that conversation.

"Q. I am talking about the second conversation, after you talked to Joe Sensenbrenner and you went back to your mother, do you recall the general substance of that conversation?

"A. I was reporting back to my mother that Joe Sensenbrenner agreed that the gift giving program should be considered."

While there is evidence to support the fact that John assisted his mother at her direction with her estate plan revisions of October and November of 1973, the nature of this assistance must be distinguished as the evidence in the record does not indicate he served as her confidential advisor on these matters. The record as a whole supports the conclusion that John did not maintain a confidential relationship with his mother and thus the trial court's finding must be sustained and it is supported by the reviewing standard of the great weight and clear preponderance of the evidence. The appellant-objector's proof was insufficient to permit the inference to be drawn that John acted without Julia's permission in procuring the services of Atty. Sensenbrenner.

*The Existence of Suspicious Circumstances*

Even if we were to conclude that a confidential relationship existed between John and his mother, this fact is not conclusive to raise the presumption of undue in-

fluence as it must be remembered that: "The basis for the undue influence presumption lies in the ease in which a confidant can dictate the contents and control or influence the drafting of such a will. . . The relationship must be such that the testator depends upon the advice of the confidant in relation to the subject matter of the will." *Estate of Steffke, supra* at 51. *See also: Estate of Velk, supra* at 507. Thus, our inquiry is directed to whether the record indicates the existence of suspicious circumstances establishing that John used his position in the familial relationship to his advantage and destroyed Julia's "free agency" in the disposition of her estate.

The appellant-objector argues that there are suspicious circumstances established by the following events: (1) Julia unexpectedly, after her husband's death, revised an estate plan she had maintained for at least 15 years and for the first time undertook the gifting of personal assets to John and his family; (2) that her physical condition, coupled with the extensive medications she ingested, weakened her physical and mental conditions prior to the execution of the will of November 1, 1973.

The objector urges this court to more closely scrutinize the facts he has alleged in his claims of suspicious circumstances because of Julia's failing health and alleged drugged condition. The will objector established that the 81 year-old testatrix had taken numerous medications for the past 4 years in treatment of various physical infirmities which included arteriosclerosis, heart problems, arthritis and tension headaches. Julia's daily medication schedule from 1970–74 is reflected in the following:

On arising 2 Ascriptin, 1 calcium Gluconate, Thorazine, Thyroid, Lanoxin, Hytakerol. At Noon, 2 Ascriptin, Calcium Gluconate, Thorazine. At 4:00 p.m. 2 Ascriptin, Calcium Gluconate, Thorazine. At 6:00 to 8:00 p.m. 2 Ascriptin, Calcium Gluconate, Thorazine, Hytakerol. At bedtime, Tuinal, which is also a sleeping medication

which would occasionally be used in place of Quaalude or other sleeping medications, but never together. Thorazine and Benadryl. In addition Fiornal with Codeine as needed every three or four hours or 2 Fiornal every three hours for severe headache.

It is further established through the testimony of Dr. Paul Johnson, a psychiatrist, that Tuinal, Fiornal and Fiornal with Codeine [an opium derivative] are barbituates. Dr. Johnson testified that these drugs would have a depressing effect on Julia, possibly lessening both her mental strength and resistance to outside pressures. Dr. Johnson noted from Julia's medical history that she was taking Triavil, a tranquilizer normally prescribed for mental depression. The prescription required Julia to ingest this drug four times daily and the psychiatrist testified that this dosage of Triavil was misprescribed and excessive for Julia's age, weight and physical condition. In conclusion, Dr. Johnson opined that due to the amount and nature of Julia's medications, she was susceptible to undue influence.

The appellant-objector's case of undue influence primarily relies on his testimony and that of Dr. Johnson in support of the contention that Julia's revision of her 15 year-old estate plan was not the product of her own free will. However, this medical testimony is not persuasive as Dr. Johnson had never examined nor personally treated the testatrix and based his conclusions solely on his examination of the medical records of the deceased. The testimony of Dr. Dedmond, Julia's personal physician since 1965, rebutted Dr. Johnson's medical conclusion. Dr. Dedmond unequivocally stated that following the Colonel's death, Julia's mental capabilities were "considerable" and "the same as he had always observed in her." In fact, the witnesses, when called to testify about Julia's personality in the months of October and November, 1973, stated in various terms that Julia was intelli-

gent, independent, strong-willed, domineering, decisive and opinionated. Agnes Mullen stated that Julia's deceased husband was the only person she knew of who could influence the testatrix or to whom she would defer. Without question, it is evident that the overwhelming testimony concerning Julia's strong and dominant personality supports the inference that if the November 1, 1973 will did not express her specific testamentary intentions, Julia would not have signed and approved the same as well as delivering the new will to Agnes Mullen and personally directing the destruction of her prior will and codicils.

Mrs. Mullen's testimony also reveals that she had often heard Julia in the presence of the Colonel announce that she was going to leave everything in her estate to John. Thus, it can be inferred that the Colonel was aware of his wife's desire to leave the entire estate to their only natural issue, John, including assets subject to the marital trust powers of appointment. The objector contends that it is suspicious that a 15 year-old estate plan paralleling her husband's testamentary intentions would be "hastily" abandoned immediately following his death. However, the record indicates to the contrary; the will was not hastily abandoned but was carefully considered, drafted and reviewed in the weeks following the Colonel's death. The new will took into consideration Julia's personal assets, her tax position and the new assets she was receiving from her husband's estate. It is not unnatural that this strong-willed woman would, in the interests of marital harmony, acquiesce to her husband's estate plans during his lifetime, knowing that upon his death she could rewrite her will for the exclusive benefit of the only child born to her marriage with the Colonel. John, rather than the step-children, was the natural object of her bounty. The history of this family relationship gives logical reason and cause for the bequeathing of her

bounty to John and is supported by ample evidence that she did not enjoy a close relationship with her stepchildren. This is in sharp contrast to the fine relationship she enjoyed with her son, John, and his family. This relationship included daily visits on John's part for many years as well as his comforting her during the Colonel's final illness. James, on the other hand, was not present to provide such comfort and aid to his stepmother and father during their final days. In *Estate of McGonigal,* 46 Wis.2d 256 (1970), the court noted:

". . . There is nothing wrong with aiding and comforting a failing testator; indeed, such activity should be encouraged. The fact that the testator is wealthy should have no effect on this encouragement." *Id.,* at 290.

In *Estate of Elvers,* 48 Wis.2d 17, 179 N.W.2d 881 (1970), the court stated: ". . . while a change of beneficiary is of some significance, it is not controlling that the change was caused by undue influence." *Id.* at p. 20. Nor is it controlling that John admitted that on occasion he discussed Julia's estate plan with her. In *Estate of Perssion,* 20 Wis.2d 537, 123 N.W.2d 465 (1963) the court noted that advice and counsel given to the testator in and of itself is not indicative of undue influence:

"All humanity is susceptible to influence—that is the nature of man. But all influence is not wrong or undue; it is often quite good. 'Influence becomes undue when it commands or compels the exercise of volition on the part of the person subject to such influence so that the result in the accomplishment of the will or purpose of the one using influence rather than, in fact, the will or purpose of the donor. The nature of the influence is in the form of mental persuasion or compulsion but not necessarily fear, which is the element of duress. The degree of persuasion which is unfair depends on a variety of circumstances. Both permissible influence and undue influence may induce a transaction. The distinction is whether the result was produced by influencing a freely exercised and competent judgment or by dominating the

mind or emotions of the person susceptible to the influence.' *Kuehn v. Kuehn* (1960), 11 Wis.(2d) 15, 24, 104 N.W.(2d) 138." *supra* at 543.

In this case, even if John's relationship with his mother could have been classified as confidential in the eyes of the law and if he had procured the legal services used as alleged in preparing her last will as well as rendering advice on her revised estate plan, the evidence is overwhelming that his mother was possessed of a strong, vibrant and unwavering mind whose propensity to undue influence was a virtual impossibility. It was stated in the *Will of Schaefer*, 207 Wis. 404, 411, 241 N.W. 382 (1932) that aid and assistance to a testator must be distinguished from undue influence:

"Undue influence should not be confused with that highly proper influence which results naturally from kindnesses done, or love and affection bestowed, which rightly and naturally give rise to feelings of esteem and gratitude. [citation omitted]. As was said in *Mackall v. Mackall*, 135 U.S. 167, 172, 10 Sup. Ct. 705:
" 'Influence gained by kindness and affection will not be regarded as 'undue' if no imposition or fraud be practiced, even though it induced the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. . . . It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them.' " *Id.* at 411.

The record supports that Julia's decision in her last will to exercise the marital trust powers of appointment solely for John's benefit and thus disinheriting her stepchildren was unquestionably her own intention and not a product of undue influence. This conclusion is further

supported by the uncontradicted testimony of Agnes Mullen and Mowry Smith, Julia's nephew, that John possessed a passive personality that was unlikely to influence his mother's domineering and independent spirit. The record supports that even though John may have discussed his mother's estate planning with her, this conduct certainly could not be characterized as destroying the "free agency" of the testatrix in the making of her November, 1973 will.

The evidence offered by the will's proponent supporting the natural circumstances surrounding Julia's last will and testament is overwhelming and rebuts the objector's allegations of undue influence. Another element of the objector's contention of undue influence is that John asked the attorney in March, 1974 to change the will and provide the inheritance be received in trust rather than an outright bequest to avoid certain estate taxes. The appellant also points out that shortly after Julia's return from Florida in April, 1974 John "guided" her hand in the signing of certain stock transfer papers as well as providing him with a general power of attorney. The court finds these contentions unpersuasive as the evidence of John's activities some 5 months after the execution of the will is irrelevant to the question of undue influence at the time of the making of her testamentary bequest. *Estate of Elvers, supra* at 21 and *Estate of Brehner,* 41 Wis.2d 349, 351, 164 N.W.2d 318 (1969) hold that a will objector must prove the overreaching was contemporaneous with the making of the will.

Also, the appellant on appeal attempts to undermine the credibility of the proponent's witnesses but the law is clear that the determination of credibility is the sole province of the trial court sitting as the trier of fact and will not be upset unless there is an abuse of discre-

tion or an error of law. *In re Estate of Christen,* 72 Wis. 2d 8, 22, 239 N.W.2d 528 (1976) ; *In re Russell's Will,* 257 Wis. 510, 44 N.W.2d 231 (1950) *In Posnanski v. City of West Allis,* 61 Wis.2d 461, 465–66 the court stated in this regard :

"The trial judge, when acting as the factfinder, is the ultimate arbiter of the credibility of a witness. His determination in that respect will not be questioned unless his findings are based upon caprice, an abuse of discretion or an error of law." *Id.* at 465–66.

The above-described factors are not present in this case and the trial court was entitled to find the proponent's witnesses worthy of belief and reach the conclusion that undue influence was not present prior to nor during the making of Julia's last will and testament.

Inasmuch as the court has determined earlier in this opinion the question of undue influence as related to the revision of the 15 year estate plan and Julia's alleged drugged condition, the final problem presented deals with the question of undue influence relating to the beneficiary's presence in his mother's home prior to and at the time of the execution of the will. This court will not upset the trial court's finding of an absence of suspicious circumstances as the record establishes that John, a devoted son, had been making daily visits to his parents' home for sometime and had been invited into Julia's living room by her during the execution of the will. Nor will the court find it a suspicious circumstance that Julia would revise her will and undertake a gift program for the benefit of her grandchildren as they also were the natural objects of her bounty and the same assets they now received had previously been bequeathed to their father under the 1959 will. Additionally a gift program of this type is the preferred method of estate planning

in bequeathing assets of this size in order to avoid the imposition of greater estate taxes.

We hold it is not unusual for a testatrix to exercise the power of appointment over marital trust assets bequeathing her entire estate to her own child, leaving nothing to the children of her spouse's earlier marriage. The record, reviewed as a whole, supports the trial court's findings that the appellant failed to prove suspicious circumstances during the preparation, review and execution of Julia's last will and testament in October and November of 1973. Thus, we hold the trial court's findings of fact and conclusions of law regarding the insufficiency of the quantum of proof required to support the appellant's theory of undue influence are not against the great weight and clear preponderance of the evidence.

*By the Court.*—Order affirmed.