COURT OF APPEALS
DECISION
DATED AND FILED

December 6, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1345**

Cir. Ct. No. **2015CV1733**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

J. STEVEN TIKALSKY,

  PLAINTIFF-APPELLANT,

 V.

SUSAN TIKALSKY A/K/A SUSAN FRIEDMAN, JAMES TIKALSKY, AMENDED & RESTATED DONALD J. TIKALSKY & BETTY LOU TIKALSKY REVOCABLE TRUST BY SUSAN TIKALSKY A/K/A SUSAN FRIEDMAN, TRUSTEE,

  DEFENDANTS-RESPONDENTS.

APPEAL from orders of the circuit court for Waukesha County: MARIA S. LAZAR, Judge. *Affirmed in part; reversed in part and cause remanded with directions.*

Before Gundrum, P.J., Neubauer and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. This appeal concerns a long-running estate-planning dispute. J. Steven Tikalsky ("Steven") appeals a grant of summary judgment in favor of his siblings, Susan and James Tikalsky, and the trust created by his late parents, the Amended & Restated Donald J. Tikalsky & Betty Lou Tikalsky Revocable Trust.[1]  Through the years, the nine claims Steven originally advanced in this case have been eliminated, either as a result of Steven's voluntary dismissals or because of summary judgment decisions adverse to Steven.

¶2    Steven's appellate arguments pertain to one of the claims—undue influence—dismissed on summary judgment. He argues he met his burden of production regarding both the four- and two-element tests for undue influence and the circuit court therefore erred by dismissing that claim on summary judgment. Given the evidence available to the circuit court at the time, we conclude it properly granted summary judgment on the undue influence claim in favor of the Trust.

¶3    Steven also argues the circuit court erred by imposing sanctions against him, which sanctions consisted of awarding the Trust the attorneys' fees it incurred in connection with several motions. We reject Steven's argument that the court erred when it determined that six of Steven's causes of action were frivolous, all of which he voluntarily dismissed immediately after the Trust moved for summary judgment. We also conclude the court's factual finding that two motions

---

[1]  We refer to the Respondents collectively as "the Trust." Susan and James individually will be referred to using their given names or, alternatively, as "the siblings."

were brought for purposes of delay was not clearly erroneous. Additionally, we reject Steven's argument that the court improperly determined he had forfeited any unclean hands defense.

¶4    The circuit court also retained jurisdiction in contemplation of a future award of attorneys' fees depending on the outcome of this appeal. We agree with Steven that it was error to do so. Nonetheless, we conclude the Trust is entitled to its costs on appeal. *See* WIS. STAT. § 809.25(1)(a)5. (2021-22).[2] We also conclude the Trust is entitled to the attorneys' fees it incurred in connection with defending the circuit court's frivolousness determination on appeal, in an amount to be determined by the circuit court. For the foregoing reasons, we affirm in part, reverse in part, and remand with directions.

## BACKGROUND

¶5    Donald and Betty Lou Tikalsky had four children: Steven, Susan, James, and Terry, all of whom were born in the 1950s. Donald practiced law with Steven from the mid-1970s until Donald's retirement in 2007. Relations between Steven and the rest of the family became strained starting sometime in the early 2000s.[3] Even Donald's departure from his law firm became contentious, and

---

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[3] The parties disagree about when the estrangement started. The Trust asserts the inception of the estrangement was Christmas Eve of 2000, when Steven's wife left the family gathering; Steven asserts it began in early 2002, when the family held a meeting with psychiatrist Dr. Judian Smith concerning the allegedly erratic behavior of Steven's wife. For purposes of this opinion, we need not—and, in fact, cannot given the procedural posture of this case—determine which of these accounts is accurate. As explained elsewhere in this opinion (and as the circuit court recognized), the dispute about the origins of the estrangement does not constitute a genuine dispute of material fact that would preclude summary judgment on the undue influence claim at issue in this appeal.

Donald retained counsel, Attorney Greg Scallon, to resolve the remaining issues through litigation if necessary. Donald passed away on September 10, 2009, at the age of 85. Betty Lou passed away on September 3, 2014, at the age of 90.

¶6     As of 1999, Donald and Betty Lou planned for most of their estate to be divided equally amongst their four children. They subsequently executed wills and trust documents over a number of years in the mid-2000's that progressively narrowed Steven's inheritance. He was disinherited entirely in 2007, in explicit language that acknowledged Steven and his children were "intentionally left out of this bequest …. Steven's children have been well taken care of through educational trusts for each, but none of the family seems to appreciate the gift or other gifts made to them." The 2007 and 2008 wills and trust documents were drafted by Donald. In 2009, approximately six months prior to Donald's death, Donald and Betty Lou retained an estate planning attorney to draft wills and a revocable trust that continued Steven's disinheritance. The final wills were signed on April 8, 2009.

¶7     After Donald's death, Steven learned that he had been excluded as a beneficiary under the joint estate planning documents Donald and Betty Lou executed in 2009. He filed the present lawsuit on September 1, 2015, after Betty Lou's death. As our supreme court aptly observed when summarizing Steven's claims in a prior appeal, "Steven believes two of his siblings, Susan and James, wrongfully caused his estrangement from his parents and subsequent disinheritance." *Tikalsky v. Friedman*, 2019 WI 56, ¶4, 386 Wis. 2d 757, 928 N.W.2d 502.

¶8     Steven's complaint advanced nine claims, six of which were voluntarily withdrawn after the Trust filed its first motion for summary judgment.

4

The circuit court dismissed two more claims on summary judgment: one seeking the imposition of a constructive trust and another seeking a declaratory judgment invalidating his parent's wills and trust as tainted by his siblings' undue influence.[4]  The circuit court denied the Trust's motion for summary judgment on Steven's final claim for intentional interference with expected inheritance, leaving that as the sole remaining claim.

¶9      The parties engaged in extensive discovery and motion practice on the intentional interference claim during the ensuing years, only to see it stayed and ultimately dismissed with prejudice just before the scheduled trial.[5]  Upon remittitur from the supreme court's *Tikalsky* decision, the circuit court scheduled a three-week trial on that claim commencing on February 24, 2020.  In December 2019, Steven sought to voluntarily dismiss the remaining claim "with prejudice and without costs and/or attorney's fees to any party."  The Trust did not contest the voluntary dismissal, but it requested half of the approximately $1 million in attorneys' fees it incurred in defending the action or, alternatively, attorneys' fees incurred in connection with several motions filed between 2016 and 2018.[6]

¶10     The circuit court granted the voluntary dismissal of the remaining intentional interference claim, but it qualified that dismissal by setting forth the

---

[4] The dismissal of the claim seeking the imposition of a constructive trust was reviewed by the Wisconsin Supreme Court in *Tikalsky v. Friedman*, 2019 WI 56, 386 Wis. 2d 757, 928 N.W.2d 502.  That claim is resolved and is not part of this appeal.

[5] After the supreme court granted review in *Tikalsky v. Friedman*, 2019 WI 56, 386 Wis. 2d 757, 928 N.W.2d 502, it stayed the trial on the intentional interference with inheritance claim until it had resolved the constructive trust issue.

[6] The Trust had previously requested attorneys' fees in connection with the motions; those requests were taken under advisement by the circuit court pending resolution of the case. The subject matter and context of the motions are discussed more thoroughly later in this opinion.

terms and conditions it deemed proper pursuant to WIS. STAT. § 805.04(2).[7]  First, the court concluded that the Trust was entitled to statutory costs pursuant to WIS. STAT. § 814.03(1).

¶11      Second, the circuit court rejected the Trust's request for half of its total attorneys' fees—at least for the time being.  The court determined the case was not truly at an end; rather, Steven sought to voluntarily dismiss his last remaining claim merely to set the stage for an appeal of the dismissal of his undue influence claim and, eventually, a trial before a different judge.  The court remarked upon the seemingly undying nature of the undue influence claim, labeling it "vampire-like, merely buried underground without a stake in its heart and … eerily awaiting resuscitation by an appellate court."  As a result, the court concluded an award of half of the Trust's attorneys' fees might be appropriate in the future:

> If there is no appeal filed, or if the appeal is denied as being brought in bad faith, or even if it is denied on other grounds, this Court shall retain jurisdiction and this Court—not another Court (despite all the blatant judge-shopping efforts)—*shall* be the Court that will hear Defendants' renewed motion for attorneys' fees and costs as the dismissal will be deemed to have been without prejudice to the extent that future litigation was contemplated and attempted.[8] …   The Court retains

---

[7] The Trust asserts the attorneys' fees were awarded pursuant to its motions, not as a condition of the circuit court permitting Steven to voluntarily dismiss his last surviving claim. We note that the order states that the "proper terms and conditions" upon which the voluntary dismissal was granted would be set forth in the remainder of the order, which included the discussion of attorneys' fees.  Regardless of how one frames the matter, our determination that the circuit court did not erroneously exercise its discretion remains the same.

[8] The significance of the "with prejudice"/"without prejudice" distinction is that an award of attorneys' fees generally does not accompany a voluntary dismissal with prejudice, where the defendant is protected from the risk of further litigation.  *See Bishop v. Blue Cross & Blue Shield United of Wis.*, 145 Wis. 2d 315, 317-18, 426 N.W.2d 114 (Ct. App. 1988).

jurisdiction and will consider a renewed motion under appropriate circumstances.

¶12    Third and finally, the circuit court concluded the Trust was entitled to its attorneys' fees and costs incurred in connection with several motions during the litigation:

- The Trust's April 25, 2016 summary judgment motion, for costs and attorneys' fees incurred in defending against the six claims Steven voluntarily dismissed in response to that motion.

- Steven's October 19, 2017 Motion for Stay or Adjournment of Trial Date, and his January 3, 2018 Renewed Motion to Compel Susan Tikalsky to Produce Trust Records; the court concluded these motions unnecessarily and frivolously delayed the trial because Steven did nothing to subsequently obtain records he represented were essential to his case.

- Steven's June 15, 2018 Motion to Stay Proceeding and Remove Trial Date Pending Remittitur and Substitution; the court concluded this motion, made after similar requests to this court and to the Wisconsin Supreme Court had been denied, was made for the purpose of delay.

The court also chastised Steven for attempting to include in his reply brief "information and documents" not previously filed to "bolster Plaintiff's certain appeal on the dismissed undue influence cause of action." The court characterized these new filings as "disingenuous, inappropriate, borderline egregious and definitely an effort to blind-side this Court and to stack the deck for the appeal."

¶13    Steven sought reconsideration or clarification regarding the circuit court's retained jurisdiction and portions of the attorneys' fees award. Regarding retained jurisdiction, the court concluded its prior order was clear and that there

was no manifest error of fact or law in retaining jurisdiction to award attorneys' fees in the future, depending on the outcome of the appeal.[9]

¶14    Regarding the award of attorneys' fees, the court had rejected in its earlier order Steven's argument that the Trust had unclean hands and had committed fraud by filing false affidavits and misrepresentations affecting the disposition of the undue influence claim.  The court found there was no basis to reconsider its rejection of the unclean hands doctrine, because nothing Steven presented changed the court's view that he was dilatory in bringing the allegedly false information to the court's attention.[10]  Specifically, the court noted Steven was aware of the allegedly false testimony in October 2017, but he had not raised the matter until the end of the case.  Finally, the court concluded it had properly awarded the Trust its attorneys' fees on the four motions set forth above.

¶15    The Trust submitted an affidavit containing invoices for its attorneys' fees expended in connection with the relevant motions.  Steven objected to the reasonableness of those fees.  Following briefing, the circuit court rejected

---

[9] As relevant here, the circuit court posited two scenarios: either the present appeal would be denied by this court (as being brought in bad faith or otherwise), in which case the circuit court would deem Steven's voluntary dismissal as being "without prejudice" for the purpose of awarding further attorneys' fees; or Steven would be successful in his appeal and, upon remittitur, he would have a right to substitution, in which case further proceedings would be handled by a different judge.

[10] Because the circuit court had not awarded any attorneys' fees relating to the undue influence claim, the court also concluded the allegations of misconduct were misdirected and designed solely to backfill the appellate record.

Steven's challenges and found that attorneys' fees in the amount of $72,795.33 were both reasonable and appropriate. Steven now appeals.[11]

---

[11] During the pendency of this appeal, the parties engaged in considerable motion practice before this court, including a motion by Steven to supplement the appellate record. We remanded that matter to the circuit court for fact-finding and on May 14, 2021, the court entered a forty-page order finding that the existing record was missing some documents that had been previously filed. The court ordered the record supplemented with documents comprised of Attorney Scallon's client file for Donald. It also ordered that certain record documents remain sealed. The supplemented record was then transmitted to this court.

Steven then filed an objection in this court to the circuit court's findings. By order dated September 22, 2021, we determined Steven was attempting to challenge two aspects of the remand proceedings: (1) the court's decision to strike exhibits attached to his affidavit because they had not been previously filed; and (2) the court's decision to seal certain filings. We concluded Steven's objections did not permit us, in the context of the pending motion to supplement the record, to resolve his challenges to the circuit court order. We held the motion to supplement the record in abeyance so that those issues (and any others relating to the record) could be raised in the appellate briefs.

Steven's appellate brief, however, fails to address the issues he raised in his objection to the circuit court's findings. He does not directly challenge either the circuit court's decision to strike exhibits or the court's decision to seal certain filings. In fact, the only arguable reference to the supplemented record is his assertion that he is "disadvantaged by his inability to view all of the documents relied upon by the circuit court," and he requests that we conduct our own de novo review of the client file to determine "whether fraud used in obtaining and using [Attorney] Scallon's services overcomes Susan's assertion of attorney-client privilege."

While we acknowledge the limitations upon Steven's ability to view the client file produced for in-camera inspection—limitations that were to a large extent ameliorated by Susan's inadvertent disclosure of the documents during the litigation—this court's functions do not permit us to sift through more than 1,500 pages of record items for evidence to support Steven's challenge to the privileged nature of the documents. *See **United States v. Dunkel***, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); ***Industrial Risk Insurers v. American Eng'g Testing, Inc.***, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("[W]e will not abandon our neutrality to develop arguments.").

These doctrines of judicial restraint are even more apt where Steven has not taken advantage of the opportunity to brief the issues he sought to raise in his objection letter. And his request for an examination of the client file is explicitly conditioned upon a decision by this court reversing the dismissal of his undue influence claim—which is not warranted, as explained elsewhere in this opinion.

(continued)

**DISCUSSION**

¶16    Steven primarily appeals two things: (1) the dismissal of his undue influence claim on summary judgment; and (2) the circuit court's decision to award attorneys' fees incurred in connection with four motions during the litigation. He raises several sub-issues within these broad categories, which we address more fully below.

*I. Summary Judgment—Undue Influence*

¶17    Our methodology for reviewing a grant of summary judgment is well-established. We review a grant of summary judgment de novo. ***Estate of Paswaters v. American Fam. Mut. Ins. Co.***, 2004 WI App 233, ¶13, 277 Wis. 2d 549, 692 N.W.2d 299. Summary judgment is appropriate when the moving party is entitled to judgment as a matter of law and no genuine issue of material fact exists. WIS. STAT. § 802.08(2). At the summary judgment stage, all facts and reasonable inferences from those facts are viewed in the light most favorable to the nonmoving party. ***Bohm v. Leiber***, 2020 WI App 52, ¶8, 393 Wis. 2d 757, 948 N.W.2d 370.

¶18    A duly executed will is presumed valid absent a showing of undue influence. ***Sensenbrenner v. Sensenbrenner***, 89 Wis. 2d 677, 685, 278 N.W.2d 887 (1979). Undue influence can be proven using either a four-element test or a

_____

As a result, we reject Steven's objections to the circuit court's remand order. The motion to supplement the record was fully addressed by the circuit court during the remand proceedings, and the existing appellate record includes the supplemental documentation ordered by the circuit court. We take no further action on the motion to supplement.

two-element test. ***Odegard v. Birkeland***, 85 Wis. 2d 126, 135, 270 N.W.2d 386 (1978).

### A. Four-Element Test

¶19    To void a will under the four-element test, the plaintiff must demonstrate the susceptibility of the testator to influence, the disposition and opportunity of another person to exercise such influence, and a coveted result, i.e., a result indicating the exercise of undue influence by the person so disposed and so situated. ***Hickey v. Hickey***, 252 Wis. 542, 547, 32 N.W.2d 232 (1948). Generally, proof of undue influence rests on circumstantial evidence, and when three of the four elements are satisfied, courts require only slight evidence on the fourth. ***Becker v. Zoschke***, 76 Wis. 2d 336, 347-48, 251 N.W.2d 431 (1977).

¶20    Of the four elements, the circuit court found Steven's evidence lacking as to disposition to influence and a coveted result. We agree that there is no evidence, or reasonable inferences therefrom, that would create a triable issue as to those elements.[12]

¶21    Disposition to influence on the part of another does not mean "a mere desire to obtain a share of the estate." ***Becker***, 76 Wis. 2d at 350. Rather, such disposition "implies a willingness to do something wrong or unfair to obtain a share of the estate. There must be evidence of grasping and overreaching … [or] of conduct which is designed to take unfair advantage." ***Id.*** Thus, our attention is

---

[12] Cognizant of the circuit court's concerns regarding Steven backfilling the summary judgment record using his later filings, we confine our analysis to the information that was available to the circuit court at the time of the motion. Our doing so is consistent with the summary judgment methodology. *See **Green Spring Farms v. Kersten***, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).

focused on both the "character and activities" of the alleged influencer. *See Kehrberg v. Pribnow*, 46 Wis. 2d 205, 214-16, 174 N.W.2d 256 (1970).

¶22 The evidence supporting disposition to influence was a matter the circuit court explored in considerable depth at the summary judgment hearing. For purposes of the motion, the court accepted Steven's arguments that the evidence, and reasonable inferences therefrom, showed that James was jealous of his brother's career and professional relationship with Donald; that Steven's estrangement started in 2002 when Steven's siblings encouraged a family meeting with a psychologist concerning seemingly erratic behavior by Steven's wife; that Steven and his family had subsequently been excluded from family events; and that Susan encouraged Donald to initiate litigation after Donald separated from the law firm. Nonetheless, the court determined this evidence was insufficient given the dearth of proof that these actions were done for the purpose of excluding Steven from his parents' estate plan.

¶23 On appeal, Steven has refined his arguments even further. Now, he argues that two passing references to him in communications by his siblings, coupled with "the siblings' urging Donald to commence lawsuits against Steven" following the windup of their former firm, are sufficient proof of a desire to obtain Steven's share of the estate by wrongful means. The two references to Steven in the siblings' communications—James's somewhat ambiguous statement that he has "always been jealous of Steve's relationship with Don?" and Susan's apparent description of Steven as a "perfect kid" in the eyes of their parents—hardly evidence an intent to do something wrongful, grasping, or overreaching to obtain a share of the estate. And Susan's apparent insistence that Donald sue Steven occurred after Donald had drafted the 2007 trust excluding Steven as a beneficiary.

¶24 At the heart of Steven's undue influence claim is the notion that his siblings deliberately created a rift between himself and his parents to obtain his share of the inheritance. Steven claims his siblings fed false information to Donald and Betty Lou regarding him and his wife, poisoning the well for his inheritance. Setting aside for the moment whether the information was actually false (there are disputes of fact in that regard), the law appears clear that false statements, standing alone, are insufficient to support a claim of undue influence.

¶25 Steven primarily relies on *Hickey*, in which our supreme court upheld a finding that the decedent's will was obtained by undue influence. The decedent, Martha, left her estate to a brother, William, who had cared for her for only a short time before her death. *Hickey*, 252 Wis. at 544-46. Martha disinherited the remainder of her family, including another brother who was a longtime caregiver. *Id.* The court observed: "The deliberate efforts made by William and his wife to alienate Martha's affections from the rest of the family do not evince a brotherly, kindly and benevolent purpose; they evince a disposition to exercise undue influence for personal benefit." *Id.* at 548. From this, Steven reasons that the disposition element is satisfied by proof that a beneficiary has spoken negatively of other, similarly situated beneficiaries.[13]

¶26 Of course, context is critical in undue influence cases, *see Hamm v. Jenkins*, 67 Wis. 2d 279, 293, 227 N.W.2d 34 (1975), and Steven ignores important facts in *Hickey* that clearly demonstrated an intent by William to influence his sister's estate planning. William objected to efforts by the family to

---

[13] We decline to use Steven's preferred term, "defamation." "Defamation" has a specific legal meaning that Steven neither articulates nor attempts to apply. *See Laughland v. Beckett*, 2015 WI App 70, ¶22, 365 Wis. 2d 148, 870 N.W.2d 466.

ensure that Martha's estate would be distributed according to the laws governing intestacy. *Hickey*, 252 Wis. at 545. When Martha became seriously ill, William hired an attorney who was a stranger to the family to draft the will, which was executed three days prior to her death. *Id.* at 546.

¶27 Here, even accepting for purposes of summary judgment that Steven's siblings made false statements that caused or exacerbated the period of estrangement, Steven has failed to create any sort of evidentiary nexus between those statements and his disinheritance. The circuit court correctly identified that there was no evidence, or reasonable inferences therefrom, that would tend to suggest the siblings' actions were meant to persuade Donald and Betty Lou to disinherit Steven.[14] The existing evidence does not allow an inference that Steven's siblings desired a greater share of the estate, let alone permit a reasonable factfinder to conclude that they were willing to use wrongful means to obtain it.

¶28 *Lauterjung v. Ford*, 19 Wis. 2d 436, 445, 120 N.W.2d 647 (1963), is controlling on this point. In *Lauterjung*, the decedent gave his brother Charles directions for drafting a will. *Id.* at 441. Charles, who had previously implored the decedent to allow him to manage the decedent's financial affairs, had his lawyer draft the will and returned with the draft to the hospital where the decedent was living. *Id.* After the will had been executed, the decedent told others that his sister's children (who ultimately contested the will) were attempting to sue him

---

[14] Moreover, Steven glosses over the considerable evidence that there were periods during which family members made overtures to Steven to repair the rift, efforts that were rebuffed by Steven. While Steven is correct that there are factual issues surrounding some of the communications, there are also many communications for which the sender, recipient and contents are undisputed.

and take his property. *Id.* at 442-44. The decedent said that information came from Charles. *Id.*

¶29 The circuit court concluded the evidence of undue influence was lacking, a determination upheld by our supreme court. The court distinguished between a mere desire to influence and the use of wrongful means to do so. *See id.* at 446. Consistent with *Hickey*, the court observed that Charles's hiring his own lawyer to draft the decedent's will might have been sufficient circumstantial evidence for a fact finder to conclude that the disposition element was satisfied. *Lauterjung*, 19 Wis. 2d at 446.

¶30 But the court regarded the evidence that Charles lied to the decedent about other potential heirs as a different flavor of manipulation. An undue influence claim rests upon the concept that the testator's free agency has been destroyed by the wrongful conduct. *See Cooper v. Zold*, 28 Wis. 2d 391, 401, 137 N.W.2d 93 (1965). A testator's free will is not overcome merely because he or she has been told lies about another potential beneficiary. *Lauterjung* recognizes this: "[T]he making of false statements to injure those who might be the natural objects of testator's bounty may not constitute undue influence, because the free agency of testator is not thereby destroyed, nevertheless, such statements may constitute such fraud as will nullify the will." *Lauterjung*, 19 Wis. 2d at 447.

¶31 Notably, the supreme court's opinion in *Lauterjung* predated, by approximately thirty years, this court's decision in *Harris v. Kritzik*, 166 Wis. 2d 689, 695, 480 N.W.2d 514 (Ct. App. 1992), which for the first time established that intentional interference of expected inheritance constitutes a cause of action in Wisconsin. Consistent with *Lauterjung*, the court observed that fraud and undue influence are separate forms of tortious conduct, which is one element of the

15

intentional interference cause of action. *See id.* Given this line of case law, Steven has failed to persuade us that false statements to the testator about another potential beneficiary, absent anything more, demonstrates a disposition to influence sufficient to support a cause of action for undue influence.

¶32 Even if we were to regard Steven's weak evidence on the disposition element as minimally sufficient, his evidence fails to demonstrate a coveted result as a matter of law. A coveted result signifies "more than simply a result favorable to the person who is alleged to have exerted undue influence. The essential question is whether that person has, for no apparent reason, been favored in the will to the exclusion of a natural object of the testator's bounty." *Johnson v. Merta*, 95 Wis. 2d 141, 159, 289 N.W.2d 813 (1980). The element assesses the "naturalness or expectedness of the conveyance." *Onderdonk v. Keepman*, 81 Wis. 2d 687, 700, 260 N.W.2d 803 (1978).

¶33 As set forth in the Trust's brief, case law establishes that it is not odd or unnatural to disinherit a child after a significant period of estrangement. *See id.* (observing that courts consider a will "natural" when the record shows that the testator was alienated from the disinherited party); *Williams v. Heywood*, 256 Wis. 338, 349, 41 N.W.2d 191 (1950) ("It seems natural that the testator would not desire that a substantial portion of his property go to the children from whom he had been estranged over a long period of time."). The disinheritance in this case occurred years after the inception of the family conflict, and close in time to

Donald's rocky departure from his law firm.[15] The statements of Attorney Sheila Boothby Stevens, who drafted the 2009 estate planning documents—uncontroverted by any proof Steven has submitted—shows that the estrangement continued to be an animating factor during the final estate planning process.[16] Based upon the undisputed facts, no reasonable jury could find a coveted result under these circumstances.

### B. Two-Element Test

¶34 Next, Steven argues he has advanced sufficient evidence to survive summary judgment using the two-element test for undue influence. Using the two-element approach, the plaintiff must demonstrate a confidential relationship between the testator and the favored beneficiary, as well as suspicious

---

[15] Steven argues the contentious nature of the family's relations is a disputed issue of fact, citing his deposition testimony that he and his wife met Donald and Betty Lou occasionally at restaurants until mid-2007. That testimony does not demonstrate (or even create a factual issue about) the absence of estrangement. Moreover, Steven's own affidavit refers to his efforts, starting in 2003, to "restore family relationships." We regard it as undisputed that there was a period of estrangement, at a minimum following the 2002 family meeting with the psychologist.

[16] Attorney Stevens averred:

> Donald J. Tikalsky and Betty Lou Tikalsky told me that they have four children, and that they wanted to continue to exclude one of their children, J. Steven Tikalsky, and to exclude his issue, from their estate because J. Steven Tikalsky was estranged from the family for a long period of time; the estrangement was caused by J. Steven Tikalsky and his wife; J. Steven Tikalsky and his wife refused to put aside past family issues and reconcile their relationship; J. Steven Tikalsky treated Donald J. Tikalsky disrespectfully in connection with Donald J. Tikalsky's retirement from his law firm; and J. Steven Tikalsky and his wife had said some very hurtful and unkind things to them over the years.

circumstances surrounding the making of the will. *Sensenbrenner*, 89 Wis. 2d at 686.

¶35 Confidential relationships generally do not exist between parents and their children. *Id.* at 689. Confidential relationships are akin to those between an attorney and a client, or a physician and a patient. *Id.* Still, a confidential relationship between a parent and a child can be established by proof that the child procured the drafter of the parent's will or exercised some control or influence over the drafting. *Wickert v. Burggraf*, 214 Wis. 2d 426, 430, 570 N.W.2d 889 (Ct. App. 1997).

¶36 Steven asserts—without citation to the appellate record—that it was error for the circuit court to accept Susan's testimony and Attorney Stevens's affidavit as uncontroverted proof that the siblings were not involved in the 2009 estate plan's preparation. Rather, he argues the circuit court should have determined a genuine issue of material fact existed based on "evidence that his parents placed special trust and confidence in his siblings when they relied upon the siblings while seeking medical advice from their own doctors and Dr. Smith, and legal advice from Scallon and Boothby Stevens."

¶37 As an initial matter, Steven has failed to demonstrate a nexus between any "special trust" Donald and Betty Lou placed in their children regarding medical or litigation needs during their lives and the execution of the 2009 estate planning documents. *See Lee v. Kamesar*, 81 Wis. 2d 151, 164, 259 N.W.2d 733 (1977) ("If one is not the actual draftsman or the procurer of the drafting, the relationship must be such that the testator depends upon the advice of the confidant *in relation to the subject matter of the will*." (Emphais added.)) Indeed, his argument fails to provide any record evidence—or case law—that

would support a determination that there was a confidential relationship on that basis. When a parent consults with a child regarding a significant event in his or her life, even one involving the child's sibling, it does not transform the relationship into a confidential one for purposes of ascertaining whether the child exerted undue influence over the disposition of the parent's estate.

¶38    We turn, then, to Steven's proffered evidence that the siblings had a role in crafting their parents' estate plan. There was evidence that Susan was present in 2009 during a meeting between the drafting attorney and an official from a bank. The bank official provided copies of Donald and Betty Lou's then-current estate planning documents and a brief overview of the estate's assets. The drafting attorney, however, testified she was unsure why Susan was present and she could not recall that Susan added anything to the conversation. Susan did not procure the drafting attorney's services; the bank official was the source of the referral. These facts fail to establish any factual predicate for a finding of a confidential relationship between Susan and her parents.

¶39    Steven also directs us to an email from Susan indicating that she had suggested changes to the power of attorney documents—not the wills or the trust document.[17]    Steven fails to explain why this gives rise to a confidential relationship for purposes of challenging the estate plan. The children were designated as Donald and Betty Lou's agents in the power of attorney documents; surely they had an interest in knowing the scope of their responsibilities under

---

[17] There is a possible reasonable inference from the email documents that Susan and Terry advised the drafting attorney of her parents' intentions regarding the trustee role. For the reasons explained in this paragraph, we similarly conclude the evidence fails to establish a confidential relationship regarding the drafting of the estate planning documents.

those documents.[18]    In addition, even if such evidence was probative of a confidential relationship, the evidence was submitted well after summary judgment had been granted on Steven's undue influence claim and came far too late. *See* **Weaver v. Champion Petfoods USA Inc.**, 3 F.4th 927, 938 (7th Cir. 2021) ("Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.").

¶40    In all, we agree with the circuit court that the evidence Steven submitted in response to the Trust's summary judgment motion does not come close to creating a genuine issue of material fact regarding undue influence. Steven has failed to adequately substantiate his undue influence claims under either the four-element or two-element test.    On these facts, no reasonable fact finder could conclude that the wills and trust documents were procured by undue influence.[19]

## II. *Attorneys' Fees*

¶41    Steven next argues the circuit court erred by sanctioning him in connection with four motions brought during the course of the litigation.  He also challenges the court's rejection of his unclean hands defense to the Trust's motion

---

[18]  Steven's reply brief fails to even acknowledge that the subject of the emails was the power of attorney documents and not the wills or the trust.  In fact, he appends the record citation to the following sentence:  "Discovery after summary judgment revealed evidence that Susan was involved in procuring the attorney to draft the 2009 wills and Trust."

[19] Steven argues that if we reverse the grant of summary judgment, we should also reverse a ruling prohibiting him from accessing privileged portions of Attorney Scallon's client file.  Because we affirm the grant of summary judgment, we do not reach this issue.  For the same reason, we also decline to address Steven's argument that we should reverse the circuit court's rulings limiting the testimony of Donald's physician and of Steven's damages expert.

for attorneys' fees. Finally, he argues the court erred by retaining jurisdiction to consider a future request for attorneys' fees depending on the outcome of this appeal.[20]

### A. Discretion to Award Attorneys' Fees

¶42    A circuit court has inherent authority to impose sanctions for litigation misconduct. *Schultz v. Sykes*, 2001 WI App 255, ¶10, 248 Wis. 2d 746, 638 N.W.2d 604; *see also* WIS. STAT. § 802.05. "[I]t is well settled that we review a circuit court's decision to impose sanctions, as well as the particular sanction it chooses, for an erroneous exercise of discretion." *Schultz*, 248 Wis. 2d 746, ¶8. We do not substitute our own judgment for that of the circuit court; rather, we will affirm if the court examined the relevant facts, applied a proper standard of law, and reached a reasonable conclusion. *Id.* Any factual findings made by the court while exercising its discretion are reviewed using the "clearly erroneous" standard. *Jensen v. McPherson*, 2004 WI App 145, ¶37, 275 Wis. 2d 604, 685 N.W.2d 603. We review de novo whether the circuit court has applied the correct legal standard. *Landwehr v. Landwehr*, 2006 WI 64, ¶8, 291 Wis. 2d 49, 715 N.W.2d 180.

### 1. Attorneys' Fees Awarded in Connection with The Trust's April 25, 2016 Summary Judgment Motion

¶43    Steven initially brought nine claims, including his claims for undue influence, intentional interference with expected inheritance, and constructive trust. Steven voluntarily dismissed six other claims at the outset of this litigation in response to the Trust's motion for summary judgment. Those claims

---

[20] Steven does not challenge the award of attorneys' fees in connection with his June 15, 2018 motion to stay the trial proceedings.

were: (1) lack of testamentary capacity; (2) common law conversion/fraud; (3) statutory theft; (4) unjust enrichment; (5) civil conspiracy relating to the siblings' procuring the 2009 estate planning documents; and (6) punitive damages. The circuit court concluded those claims were frivolous and awarded the Trust an amount equal to the attorneys' fees incurred in connection with defending against those claims.

¶44     On appeal, Steven asserts the circuit court's frivolousness analysis erroneously focused on "the fact that he had multiplicitous claims that he voluntarily dismissed." To the contrary, the court explicitly adopted the analysis of the claims contained in the Trust's summary judgment brief. The court concluded the "elements of some of those dismissed claims were nowhere near met."

¶45     Other than waging a wholesale attack on the circuit court's analytical framework, Steven does not explain why any of the six claims he voluntarily dismissed had a reasonable legal or factual basis that would preclude a frivolousness finding. Typically, one would demonstrate the absence of frivolousness by showing that the pleading was not filed for an improper purpose, that the filing was well grounded in fact, and that the filing was warranted by existing law or a good faith argument for a change in it. *See **Jandrt ex rel. Brueggeman v. Jerome Foods, Inc.***, 227 Wis. 2d 531, 548, 597 N.W.2d 744 (1999). Steven does not attempt to make any such showing; he merely argues (incorrectly) that the court applied the wrong analysis.

¶46     Nonetheless, we have reviewed the appellate record and conclude it was sufficient to sustain the circuit court's exercise of discretion.[21]    *See Roy v. St. Lukes Med. Ctr.*, 2007 WI App 218, ¶11, 305 Wis. 2d 658, 741 N.W.2d 256 ("[W]e will search the record for reasons to sustain [the circuit court's] exercise of discretion.").

¶47     There was no evidentiary basis for Steven's claim that Donald and Betty Lou lacked testamentary capacity.    The law presumes the testator was competent; that presumption can be overcome only by clear, satisfactory, and convincing evidence that the person did not have sufficient mental ability to know what he or she was doing and the nature of the act done.    *First Nat. Bank of Appleton v. Nennig*, 92 Wis. 2d 518, 529-30, 285 N.W.2d 614 (1979); *Sorenson v. Ziemke*, 87 Wis. 2d 339, 343, 274 N.W.2d 694 (1979).    "The testimony of the attorney who drew the will and was one of the subscribing witnesses may not be lightly brushed aside or permitted to be outweighed by circumstances which give rise merely to suspicion."    *Washburn v. Washburn*, 248 Wis. 467, 473-74, 22 N.W.2d 512 (1946).

¶48     Here, even considering the entirety of the record, there was no more than mere suspicion supporting Steven's claim that Donald and Betty Lou lacked testamentary capacity.    The subscribing witnesses and the drafting attorney of the 2009 estate planning documents vouched for Donald and Betty Lou's competency.

---

[21] In a single sentence in his reply brief, Steven for the first time asserts that the circuit court's sanctions determination was procedurally flawed because it did not comport with WIS. STAT. §§ 802.05(3) or 895.044(2).  We deem the matter inadequately briefed, *see State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992), and forfeited, *see Paynter v. ProAssurance Wis. Ins. Co.*, 2019 WI 65, ¶108, 387 Wis. 2d 278, 929 N.W.2d 113 (arguments raised for the first time in the reply brief are generally not addressed).

And Steven's task of showing that he would not have been disinherited but for any mental infirmity of the decedents is nigh impossible, considering the significant period of estrangement and other undisputed facts in the appellate record. The circuit court reasonably exercised its discretion when it found this claim frivolous.

¶49 Steven's claims for common law conversion/fraud and statutory theft were similarly lacking a good-faith basis in law or fact. "A person is liable for conversion when he or she (1) intentionally controls or takes property belonging to another, (2) without the owner's consent, (3) resulting in serious interference with the owner's rights to possess the property." *Midwestern Helicopter, LLC v. Coolbaugh*, 2013 WI App 126, ¶9, 351 Wis. 2d 211, 839 N.W.2d 167. Similarly, a statutory theft claim requires proof that the defendant obtained title to the plaintiff's property by making false representations intended to deceive and defraud the plaintiff. *Ferris v. Location 3 Corp.*, 2011 WI App 134, ¶8, 337 Wis. 2d 155, 804 N.W.2d 822. The appellate record lacks anything that would have supplied a good-faith basis for these claims, given that anything the siblings acquired—even wrongfully, as Steven alleged—belonged to their parents, not to Steven.

¶50 Next, Steven alleged that Susan and James were unjustly enriched as a result of their fraudulent conduct. Steven all but admitted that this claim was frivolous in his brief to this court in a prior appeal:

> As it is implicit in a cause of action for unjust enrichment that the *plaintiff* confer the benefit on the *defendant,* Steven Tikalsky voluntarily dismissed his unjust enrichment cause of action against all defendants including Terry Stevens. Here, the benefit was not conferred upon the defendant siblings by Steven Tikalsky but rather the benefit was conferred by Donald and Betty Lou.

The circuit court properly exercised its discretion when it agreed with Steven's own assessment of his unjust enrichment claim.

¶51    Steven's next cause of action asserted that Susan and James had, by their fraudulent representations, "conspired to accomplish the unlawful purpose of exercising undue influence on Donald and Betty Lou and other bad faith conduct." There is no such thing as a civil action for conspiracy; rather, the cause of action is for the overt acts and damages that result from it.  *Onderdonk v. Lamb*, 79 Wis. 2d 241, 246-47, 255 N.W.2d 507 (1977).  As such, there was no basis in law for this claim, which was, in legal substance, entirely duplicative of Steven's undue influence claim.

¶52    Similarly, there was no basis in law for Steven's punitive damages claim.  "Punitive damages are a remedy, not a cause of action."  *Hansen v. Texas Roadhouse, Inc.*, 2013 WI App 2, ¶21, 345 Wis. 2d 669, 827 N.W.2d 99.  In all, the circuit court did not erroneously exercise its discretion by sanctioning Steven in connection with the six voluntarily dismissed claims.

### 2. Attorneys' Fees Awarded in Connection with Steven's October 19, 2017 and January 3, 2018 Motions

¶53    Steven next claims the circuit court made erroneous factual findings when it determined his October 19, 2017 and January 3, 2018 motions were made for purposes of delay.  The October motion requested a stay of the scheduled December 5, 2017 trial date because, among other reasons, Steven had yet to obtain and analyze a broad set of trust documents from First Business Trusts & Investments, the trust administrator.  The court granted this motion and set a new trial date for February 20, 2018.  By separate order, and with Steven's consent, the

court ordered First Business to produce the requested documents at Steven's expense.

¶54    Thereafter, Steven's January 2018 motion represented that First Business's estimate of the cost to search for the requested records was between $16,000 and $32,000. Steven regarded this estimate as cost prohibitive, and he sought to have Susan produce the First Business records herself. At the hearing, Steven told the court he would narrow the scope of the records he sought, asserting there was "no reason Susan Tikalsky [as trustee] can't pick up the phone and request from First Business … the what I will call skeletal records I requested today."

¶55    At a follow-up hearing, Steven stated that he had spoken with a First Business representative, who quoted $2,250 for a search for the "skeletal" records. Steven did not withdraw the motion to compel, however, and the circuit court denied it. The trial was ultimately removed from the court's February calendar for various reasons, including possible unavailability of the court if the jury did not promptly return verdicts.

¶56    In its order granting the Trust's sanctions request, the circuit court stated that Steven's motions were baseless attempts to stall the litigation because he requested a delay of the trial and then did nothing to obtain the relevant trust records. The court added that "[h]ad Plaintiff Steven not insisted that he 'needed' these documents to adequately prepare for trial, there would have been a trial on February 20-27, 2018." Steven challenges as factually incorrect the court's statements that Steven "did nothing" and that the trial would have occurred in February but for his motions.

¶57    Steven's appellate arguments miss the point of the circuit court's analysis. Steven is partially correct that the February 2018 adjournment was not caused by the trust records issue; rather, it appears that the purported need for the trust documents occasioned the December 2017 adjournment. This apparent misstatement of the date by the circuit court is a distinction without a difference: as is apparent from the court's order, the animating principle for the sanctions was that Steven had represented that certain documents were necessary to his case, which he then made no serious effort to obtain after the trial was delayed.

¶58    Even on appeal, Steven does not assert he paid the more modest $2,250 sum to obtain the Trust's bare-bones annual account statements—documents that presumably would have revealed the information Steven said he needed to know regarding Trust distributions. In light of this, his insistence that Susan produce the documents at her own expense is, at best, inexplicable. The circuit court reasonably determined that the October 19, 2017 motion to adjourn the trial and the January 3, 2018 motion to compel were made for improper purposes and therefore constituted sanctionable conduct. *See* WIS. STAT. § 802.05(2)(a).

### B. Rejection of Steven's Unclean Hands Defense

¶59    As set forth above, *see infra* ¶14, Steven had opposed the Trust's request for attorneys' fees on the basis of unclean hands, writing:

> The Court's summary judgment order dismissing the undue influence claim relied on repeated, material misrepresentations by the defendants. Because any argument that the defendants have that they are entitled to attorney fees due to their "prevailing party" status relies on perjured testimony and knowingly misleading this Court,

27

their request for Steven to pay their attorney fees should be denied.

Steven argued that Susan offered false or inaccurate testimony during her 2016 deposition, which occurred during briefing on the Trust's first summary judgment motion. Susan testified that to the best of her recollection, she learned that Steven had been disinherited shortly after Donald passed away. Discovery subsequent to the dismissal of the undue influence claim showed that Susan had been copied on the email containing the estate planning documents Attorney Stevens drafted in 2009.[22]

¶60 The circuit court inquired about this argument at the hearing on the voluntary dismissal motion on February 26, 2020, questioning Steven's attorney about when they learned of the allegedly false information. Steven's attorney responded, "This would have been when the deposition of Attorney Stevens took place, which would have been in October of 2017, a year after the motion for summary judgment was granted and, therefore, outside of the time that the plaintiff could have asked for reconsideration of that." In its decision rejecting Steven's unclean hands argument, the court noted that Steven could have requested (and, for other reasons, did successfully request) additional time for discovery in response to the summary judgment motion. He also could have sought to reopen the evidence on the undue influence claim. The court determined that Steven had "waived" his unclean hands argument by bringing the allegedly false statements to the court's attention in such a tardy fashion.

---

[22] The Trust contests that any of Susan's testimony was false. The circuit court's reasoning in rejecting Steven's unclean hands argument made it unnecessary for the court to make any factual findings in this regard.

¶61    Steven's appellate arguments mostly attack the circuit court's use of the term "waived," which indicates a finding that Steven had voluntarily and intentionally relinquished a known right. *See Bade v. Badger Mut. Ins. Co.*, 31 Wis. 2d 38, 46, 142 N.W.2d 218 (1966). It seems apparent the court meant to say that Steven had forfeited his unclean hands argument by failing to raise it. Forfeiture is the failure to make the timely assertion of a right. *State v. Washington*, 2018 WI 3, ¶31 n.11, 379 Wis. 2d 58, 905 N.W.2d 380. The terms are often confused. *Id.*, ¶36 n.12.

¶62    Beyond that, we agree with the circuit court's determination that Steven forfeited his unclean hands argument by failing to timely raise the issue.[23] He contends his "earliest opportunity to raise his unclean hands defense was in response to his siblings' request for attorneys' fees, which the court deferred until the end of the case." To the contrary, Steven had ample opportunity to raise the issue of the alleged false testimony during the multi-year pendency of the litigation, including by bringing a WIS. STAT. § 806.07(1)(c) motion alleging fraud.[24]

¶63    Indeed, it seems clear from Steven's affidavit that the absence of a motion was based not on a lack of opportunity to raise the matter but, rather, on

---

[23] The parties do not provide the standard of review for the circuit court's forfeiture determination. Even applying the most favorable standard of review for Steven—i.e., the least-deferential "question of law" standard—we agree with the circuit court.

[24] The one-year limitations period for such a motion had not yet run by the time of Attorney Stevens's deposition. *See* WIS. STAT. § 806.07(2). The order dismissing Steven's undue influence claim was entered on October 31, 2016; Attorney Stevens was deposed on October 16, 2017. In any event, the time limitation set forth in WIS. STAT. § 806.07(2) would not have precluded Steven from filing an independent action challenging the order on equitable grounds. *See generally Walker v. Tobin*, 209 Wis. 2d 72, 568 N.W.2d 303.

his failure to appreciate the significance of Attorney Stevens's testimony. Steven averred he "did not connect her testimony or the documents that she produced, which showed that the Defendants were aware and participated in the drafting of the 2009 estate planning documents, to the Court's decision dismissing my undue influence claim until approximately December 3, 2019." Steven's appellate arguments fail to persuade us that he had no earlier opportunity to raise the issue of the alleged false testimony.[25]

### C. Retained Jurisdiction

¶64 The final issue in this case is the circuit court's decision to retain jurisdiction in contemplation of a future award of the Trust's attorneys' fees depending on the outcome of this appeal. When a final order has been entered dismissing a case in its entirety and an appeal taken, the circuit court's jurisdiction over the case is generally at an end. *See Tietsworth v. Harley-Davidson, Inc.*, 2007 WI 97, ¶27, 303 Wis. 2d 94, 735 N.W.2d 418. A circuit court is authorized to act in a small number of matters pending appeal as set forth in WIS. STAT. § 808.075; our review of that statute indicates nothing to suggest that a circuit court retains the authority to award attorneys' fees contingent on the outcome of an appeal. *See Hengel v. Hengel*, 120 Wis. 2d 522, 527, 355 N.W.2d 846 (Ct. App. 1984) (*superseded in part by statute as recognized in State v Smith*, 2008 WI App 121, ¶4, 313 Wis. 2d 521, 756 N.W.2d 477).

---

[25] Steven's brief-in-chief argues (without citation to legal authority) that waiver or forfeiture doctrines are inapplicable when they implicate the "inherent integrity of the judicial process." Curiously, his brief represents that he is making this argument "personally," which we construe to mean that his attorneys have not joined this particular argument. We typically do not consider pro se arguments from represented parties. *Cf. State v. Redmond*, 203 Wis. 2d 13, 19-21, 552 N.W.2d 115 (Ct. App. 1996).

¶65     If our determination is to remand a matter to the circuit court, the court must follow our directions. *State ex rel. J.H. Findorff & Son, Inc. v. Circuit Ct. for Milwaukee Cnty.*, 2000 WI 30, ¶25, 233 Wis. 2d 428, 608 N.W.2d 679. It has some limited authority to address any matters left open, and may take such discretionary actions as are necessary, as long as they are not inconsistent with our directives. *Id.* The circuit court's decision to retain jurisdiction to award further attorneys' fees depending on the outcome of this appeal treads perilously close to this court's exclusive authority to find an appeal frivolous under WIS. STAT. RULE 809.25(3). *See Lucareli v. Vilas Cnty.*, 2000 WI App 157, ¶9, 238 Wis. 2d 84, 616 N.W.2d 153. We therefore reverse that portion of the circuit court's order retaining jurisdiction.[26]

¶66     Nonetheless, the Trust has prevailed on the substance of this appeal, and is allowed its costs on appeal pursuant to WIS. STAT. RULE 809.25(1)(a)5. Moreover, the Trust has requested attorneys' fees in connection with its defense of the circuit court's frivolousness finding on appeal. It appears the Trust is entitled to those fees. If a claim is correctly adjudged to be frivolous in the circuit court, it is frivolous per se on appeal. *Riley v. Isaccson*, 156 Wis. 2d 249, 262, 456 N.W.2d 619 (Ct. App. 1990). As a result, when a party prevails below and is entitled to reasonable attorneys' fees, "the entitlement extends to the fee reasonably incurred in defending the award on appeal." *Id.* at 261.

¶67     We therefore remand to the circuit court. On remand, the circuit court shall make a determination of the amount of reasonable attorneys' fees the

---

[26] The Trust has not cross-appealed or otherwise argued that if the circuit court erred by retaining jurisdiction, it is nonetheless entitled to its one-half attorneys' fees request.

Trust is entitled to for defending on appeal the award of attorneys' fees incurred in connection with the frivolousness finding, which in turn was predicated upon the voluntary dismissal of the six claims following the Trust's April 25, 2016 summary judgment motion. *See infra*, ¶¶43-52.

*By the Court.*—Orders affirmed in part; reversed in part and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.